# THE BREMEN ET AL. *v.* ZAPATA OFF-SHORE CO.

No. 71–322.   Argued March 21, 1972—Decided June 12, 1972

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a concurring statement, *post,* p. 20. DOUGLAS, J., filed a dissenting opinion, *post,* p. 20.

1

2

*David C. G. Kerr* argued the cause for petitioners. With him on the briefs was *Jack C. Rinard.*

*James K. Nance* argued the cause for respondent. With him on the brief was *Dewey R. Villareal, Jr.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to review a judgment of the United States Court of Appeals for the Fifth Circuit declining to enforce a forum-selection clause governing disputes arising under an international towage contract between petitioners and respondent. The circuits have differed in their approach to such clauses.[1] For the reasons stated hereafter, we vacate the judgment of the Court of Appeals.

In November 1967, respondent Zapata, a Houston-based American corporation, contracted with petitioner Unterweser, a German corporation, to tow Zapata's ocean-going, self-elevating drilling rig *Chaparral* from Louisiana to a point off Ravenna, Italy, in the Adriatic Sea, where Zapata had agreed to drill certain wells.

Zapata had solicited bids for the towage, and several companies including Unterweser had responded. Unterweser was the low bidder and Zapata requested it to submit a contract, which it did. The contract submitted by Unterweser contained the following provision, which is at issue in this case:

"Any dispute arising must be treated before the London Court of Justice."

---

[1] Compare, e. g., *Central Contracting Co.* v. *Maryland Casualty Co.,* 367 F. 2d 341 (CA3 1966), and *Wm. H. Muller & Co.* v. *Swedish American Line Ltd.,* 224 F. 2d 806 (CA2), cert. denied, 350 U. S. 903 (1955), with *Carbon Black Export, Inc.* v. *The Monrosa,* 254 F. 2d 297 (CA5 1958), cert. dismissed, 359 U. S. 180 (1959).

In addition the contract contained two clauses purporting to exculpate Unterweser from liability for damages to the towed barge.[2]

After reviewing the contract and making several changes, but without any alteration in the forum-selection or exculpatory clauses, a Zapata vice president executed the contract and forwarded it to Unterweser in Germany, where Unterweser accepted the changes, and the contract became effective.

On January 5, 1968, Unterweser's deep sea tug *Bremen* departed Venice, Louisiana, with the *Chaparral* in tow bound for Italy. On January 9, while the flotilla was in international waters in the middle of the Gulf of Mexico, a severe storm arose. The sharp roll of the *Chaparral* in Gulf waters caused its elevator legs, which had been raised for the voyage, to break off and fall into the sea, seriously damaging the *Chaparral*. In this emergency situation Zapata instructed the *Bremen* to tow its damaged rig to Tampa, Florida, the nearest port of refuge.

On January 12, Zapata, ignoring its contract promise to litigate "any dispute arising" in the English courts, commenced a suit in admiralty in the United States

---

[2] The General Towage Conditions of the contract included the following:

"1. . . . [Unterweser and its] masters and crews are not responsible for defaults and/or errors in the navigation of the tow.

"2. . . .

"b) Damages suffered by the towed object are in any case for account of its Owners."

In addition, the contract provided that any insurance of the *Chaparral* was to be "for account of" Zapata. Unterweser's initial telegraphic bid had also offered to "arrange insurance covering towage risk for rig if desired." As Zapata had chosen to be self-insured on all its rigs, the loss in this case was not compensated by insurance.

District Court at Tampa, seeking $3,500,000 damages against Unterweser *in personam* and the *Bremen in rem,* alleging negligent towage and breach of contract.[3] Unterweser responded by invoking the forum clause of the towage contract, and moved to dismiss for lack of jurisdiction or on *forum non conveniens* grounds, or in the alternative to stay the action pending submission of the dispute to the "London Court of Justice." Shortly thereafter, in February, before the District Court had ruled on its motion to stay or dismiss the United States action, Unterweser commenced an action against Zapata seeking damages for breach of the towage contract in the High Court of Justice in London, as the contract provided. Zapata appeared in that court to contest jurisdiction, but its challenge was rejected, the English courts holding that the contractual forum provision conferred jurisdiction.[4]

---

[3] The *Bremen* was arrested by a United States marshal acting pursuant to Zapata's complaint immediately upon her arrival in Tampa. The tug was subsequently released when Unterweser furnished security in the amount of $3,500,000.

[4] Zapata appeared specially and moved to set aside service of process outside the country. Justice Karminski of the High Court of Justice denied the motion on the ground the contractual choice-of-forum provision conferred jurisdiction and would be enforced, absent a factual showing it would not be "fair and right" to do so. He did not believe Zapata had made such a showing, and held that it should be required to "stick to [its] bargain." App. 206, 211, 213. The Court of Appeal dismissed an appeal on the ground that Justice Karminski had properly applied the English rule. Lord Justice Willmer stated that rule as follows:

"The law on the subject, I think, is not open to doubt . . . . It is always open to parties to stipulate . . . that a particular Court shall have jurisdiction over any dispute arising out of their contract. Here the parties chose to stipulate that disputes were to be referred to the 'London Court,' which I take as meaning the High Court in this country. *Prima facie* it is the policy of the Court to hold parties to the bargain into which they have en-

In the meantime, Unterweser was faced with a dilemma in the pending action in the United States court at Tampa. The six-month period for filing action to limit its liability to Zapata and other potential claimants was about to expire,[5] but the United States District Court in Tampa had not yet ruled on Unterweser's motion to dismiss or stay Zapata's action. On July 2, 1968, confronted with difficult alternatives, Unterweser filed an action to limit its liability in the District Court in Tampa. That court entered the customary injunction against proceedings outside the limitation court, and Zapata refiled its initial claim in the limitation action.[6]

---

tered. . . . But that is not an inflexible rule, as was shown, for instance, by the case of *The Fehmarn*, [1957] 1 Lloyd's Rep. 511; (C. A.) [1957] 2 Lloyd's Rep. 551 . . . .

"I approach the matter, therefore, in this way, that the Court has a discretion, but it is a discretion which, in the ordinary way and in the absence of strong reason to the contrary, will be exercised in favour of holding parties to their bargain. The question is whether sufficient circumstances have been shown to exist in this case to make it desirable, on the grounds of balance of convenience, that proceedings should not take place in this country . . . ." [1968] 2 Lloyd's Rep. 158, 162–163.

[5] 46 U. S. C. §§ 183, 185. See generally G. Gilmore & C. Black, Admiralty § 10–15 (1957).

[6] In its limitation complaint, Unterweser stated it "reserve[d] all rights" under its previous motion to dismiss or stay Zapata's action, and reasserted that the High Court of Justice was the proper forum for determining the entire controversy, including its own right to limited liability, in accord with the contractual forum clause. Unterweser later counterclaimed, setting forth the same contractual cause of action as in its English action and a further cause of action for salvage arising out of the *Bremen*'s services following the casualty. In its counterclaim, Unterweser again asserted that the High Court of Justice in London was the proper forum for determining all aspects of the controversy, including its counterclaim.

It was only at this juncture, on July 29, after the six-month period for filing the limitation action had run, that the District Court denied Unterweser's January motion to dismiss or stay Zapata's initial action. In denying the motion, that court relied on the prior decision of the Court of Appeals in *Carbon Black Export, Inc.* v. *The Monrosa,* 254 F. 2d 297 (CA5 1958), cert. dismissed, 359 U. S. 180 (1959). In that case the Court of Appeals had held a forum-selection clause unenforceable, reiterating the traditional view of many American courts that "agreements in advance of controversy whose object is to oust the jurisdiction of the courts are contrary to public policy and will not be enforced." 254 F. 2d, at 300–301.[7] Apparently concluding that it was bound by the *Carbon Black* case, the District Court gave the forum-selection clause little, if any, weight. Instead, the court treated the motion to dismiss under normal *forum non conveniens* doctrine applicable in the absence of such a clause, citing *Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501 (1947). Under that doctrine "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.,* at 508. The District Court concluded: "The balance of conveniences here is not strongly in favor of [Unterweser] and [Zapata's] choice of forum should not be disturbed."

Thereafter, on January 21, 1969, the District Court denied another motion by Unterweser to stay the limitation action pending determination of the controversy in the High Court of Justice in London and granted Zapata's motion to restrain Unterweser from litigating

---

[7] The *Carbon Black* court went on to say that it was, in any event, unnecessary for it to reject the more liberal position taken in *Wm. H. Muller & Co.* v. *Swedish American Line Ltd.,* 224 F. 2d 806 (CA2), cert. denied, 350 U. S. 903 (1955), because the case before it had a greater nexus with the United States than that in *Muller.*

further in the London court. The District Judge ruled that, having taken jurisdiction in the limitation proceeding, he had jurisdiction to determine all matters relating to the controversy. He ruled that Unterweser should be required to "do equity" by refraining from also litigating the controversy in the London court, not only for the reasons he had previously stated for denying Unterweser's first motion to stay Zapata's action, but also because Unterweser had invoked the United States court's jurisdiction to obtain the benefit of the Limitation Act.

On appeal, a divided panel of the Court of Appeals affirmed, and on rehearing *en banc* the panel opinion was adopted, with six of the 14 *en banc* judges dissenting. As had the District Court, the majority rested on the *Carbon Black* decision, concluding that " 'at the very least' " that case stood for the proposition that a forum-selection clause " 'will not be enforced unless the selected state would provide a more convenient forum than the state in which suit is brought.' " From that premise the Court of Appeals proceeded to conclude that, apart from the forum-selection clause, the District Court did not abuse its discretion in refusing to decline jurisdiction on the basis of *forum non conveniens*. It noted that (1) the flotilla never "escaped the Fifth Circuit's mare nostrum, and the casualty occurred in close proximity to the district court"; (2) a considerable number of potential witnesses, including Zapata crewmen, resided in the Gulf Coast area; (3) preparation for the voyage and inspection and repair work had been performed in the Gulf area; (4) the testimony of the *Bremen* crew was available by way of deposition; (5) England had no interest in or contact with the controversy other than the forum-selection clause. The Court of Appeals majority further noted that Zapata was a United States citizen and "[t]he dis-

cretion of the district court to remand the case to a foreign forum was consequently limited"—especially since it appeared likely that the English courts would enforce the exculpatory clauses.[8] In the Court of Appeals' view, enforcement of such clauses would be contrary to public policy in American courts under *Bisso* v. *Inland Waterways Corp.*, 349 U. S. 85 (1955), and *Dixilyn Drilling Corp.* v. *Crescent Towing & Salvage Co.*, 372 U. S. 697 (1963). Therefore, "[t]he district court was entitled to consider that remanding Zapata to a foreign forum, with no practical contact with the controversy, could raise a bar to recovery by a United States citizen which its own convenient courts would not countenance."[9]

We hold, with the six dissenting members of the Court of Appeals, that far too little weight and effect were given to the forum clause in resolving this controversy. For at least two decades we have witnessed an expansion of overseas commercial activities by business enterprises based in the United States. The barrier of distance that once tended to confine a business concern to a modest territory no longer does so. Here we see an American

---

[8] The record contains an undisputed affidavit of a British solicitor stating an opinion that the exculpatory clauses of the contract would be held "prima facie valid and enforceable" against Zapata in any action maintained in England in which Zapata alleged that defaults or errors in Unterweser's tow caused the casualty and damage to the *Chaparral.*

In addition, it is not disputed that while the limitation fund in the District Court in Tampa amounts to $1,390,000, the limitation fund in England would be only slightly in excess of $80,000 under English law.

[9] The Court of Appeals also indicated in passing that even if it took the view that choice-of-forum clauses were enforceable unless "unreasonable" it was "doubtful" that enforcement would be proper here because the exculpatory clauses would deny Zapata relief to which it was "entitled" and because England was "seriously inconvenient" for trial of the action.

company with special expertise contracting with a foreign company to tow a complex machine thousands of miles across seas and oceans. The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. Absent a contract forum, the considerations relied on by the Court of Appeals would be persuasive reasons for holding an American forum convenient in the traditional sense, but in an era of expanding world trade and commerce, the absolute aspects of the doctrine of the *Carbon Black* case have little place and would be a heavy hand indeed on the future development of international commercial dealings by Americans. We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts.

Forum-selection clauses have historically not been favored by American courts. Many courts, federal and state, have declined to enforce such clauses on the ground that they were "contrary to public policy," or that their effect was to "oust the jurisdiction" of the court.[10] Al-

---

[10] Many decisions reflecting this view are collected in Annot., 56 A. L. R. 2d 300, 306–320 (1957), and Later Case Service (1967).

For leading early cases, see, *e. g., Nute* v. *Hamilton Mutual Ins. Co.,* 72 Mass. (6 Gray) 174 (1856); *Nashua River Paper Co.* v. *Hammermill Paper Co.,* 223 Mass. 8, 111 N. E. 678 (1916); *Benson* v. *Eastern Bldg. & Loan Assn.,* 174 N. Y. 83, 66 N. E. 627 (1903).

The early admiralty cases were in accord. See, *e. g., Wood & Selick, Inc.* v. *Compagnie Generale Transatlantique,* 43 F. 2d 941 (CA2 1930); *The Ciano,* 58 F. Supp. 65 (ED Pa. 1944); *Kuhnhold* v. *Compagnie Generale Transatlantique,* 251 F. 387 (SDNY 1918); *Prince Steam-Shipping Co.* v. *Lehman,* 39 F. 704 (SDNY 1889).

In *Insurance Co.* v. *Morse,* 20 Wall. 445 (1874), this Court broadly stated that "agreements in advance to oust the courts of the jurisdiction conferred by law are illegal and void." *Id.,* at 451. But the holding of that case was only that the State of Wisconsin could not by statute force a foreign corporation to "agree" to surrender its federal

though this view apparently still has considerable acceptance, other courts are tending to adopt a more hospitable attitude toward forum-selection clauses. This view, advanced in the well-reasoned dissenting opinion in the instant case, is that such clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable" under the circumstances.[11] We believe this is the correct doctrine to be followed by federal district courts sitting in admiralty. It is merely the other side of the proposition recognized by this Court in *National Equipment Rental, Ltd.* v. *Szukhent,* 375 U. S. 311 (1964), holding that in federal courts a party may validly consent to be sued in a juris-

---

statutory right to remove a state court action to the federal courts as a condition of doing business in Wisconsin. Thus, the case is properly understood as one in which a state statutory requirement was viewed as imposing an unconstitutional condition on the exercise of the federal right of removal. See, *e. g., Wisconsin* v. *Philadelphia & Reading Coal Co.,* 241 U. S. 329 (1916).

As Judge Hand noted in *Krenger* v. *Pennsylvania R. Co.,* 174 F. 2d 556 (CA2 1949), even at that date there was in fact no "absolute taboo" against such clauses. See, *e. g., Mittenthal* v. *Mascagni,* 183 Mass. 19, 66 N. E. 425 (1903); *Daley* v. *People's Bldg., Loan & Sav. Assn.,* 178 Mass. 13, 59 N. E. 452 (1901) (Holmes, J.). See also *Cerro de Pasco Copper Corp.* v. *Knut Knutsen, O. A. S.,* 187 F 2d 990 (CA2 1951).

[11] *E. g., Central Contracting Co.* v. *Maryland Casualty Co.,* 367 F. 2d 341 (CA3 1966); *Anastasiadis* v. *S. S. Little John,* 346 F. 2d 281 (CA5 1965) (by implication); *Wm. H. Muller & Co.* v. *Swedish American Line Ltd.,* 224 F. 2d 806 (CA2), cert. denied, 350 U. S. 903 (1955); *Cerro de Pasco Copper Corp.* v. *Knut Knutsen, O. A. S.,* 187 F. 2d 990 (CA2 1951); *Central Contracting Co.* v. *C. E. Youngdahl & Co.,* 418 Pa. 122, 209 A. 2d 810 (1965).

The *Muller* case was overruled in *Indussa Corp.* v. *S. S. Ranborg,* 377 F. 2d 200 (CA2 1967), insofar as it held that the forum clause was not inconsistent with the "lessening of liability" provision of the Carriage of Goods by Sea Act, 46 U. S. C. § 1303 (8), which was applicable to the transactions in *Muller, Indussa,* and *Carbon Black.* That Act is not applicable in this case.

diction where he cannot be found for service of process through contractual designation of an "agent" for receipt of process in that jurisdiction. In so holding, the Court stated:

> "[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." *Id.,* at 315–316.

This approach is substantially that followed in other common-law countries including England.[12] It is the view advanced by noted scholars and that adopted by the Restatement of the Conflict of Laws.[13] It accords with ancient concepts of freedom of contract and reflects an appreciation of the expanding horizons of American contractors who seek business in all parts of the world. Not surprisingly, foreign businessmen prefer, as do we, to

---

[12] In addition to the decision of the Court of Appeal in the instant case, *Unterweser Reederei G. m. b. H.* v. *Zapata Off-Shore Co.* [*The Chaparral*], [1968] 2 Lloyd's Rep. 158 (C. A.), see *e. g.,* *Mackender* v. *Feldia A. G.,* [1967] 2 Q. B. 590 (C. A.); *The Fehmarn,* [1958] 1 W. L. R. 159 (C. A.); *Law* v. *Garrett,* [1878] 8 Ch. D. 26 (C. A.); *The Eleftheria,* [1970] P. 94. As indicated by the clear statements in *The Eleftheria* and of Lord Justice Willmer in this case, *supra,* n. 4, the decision of the trial court calls for an exercise of discretion. See generally A. Dicey & J. Morris, The Conflict of Laws 979–980, 1087–1088 (8th ed. 1967); Cowen & Mendes da Costa, The Contractual Forum: Situation in England and the British Commonwealth, 13 Am. J. Comp. Law 179 (1964); Reese, The Contractual Forum: Situation in the United States, *id.,* at 187, 190 n. 13; Graupner, Contractual Stipulations Conferring Exclusive Jurisdiction Upon Foreign Courts in the Law of England and Scotland, 59 L. Q. Rev. 227 (1943).

[13] Restatement (Second) of the Conflict of Laws § 80 (1971); Reese, The Contractual Forum: Situation in the United States, 13 Am. J. Comp. Law 187 (1964); A. Ehrenzweig, Conflict of Laws § 41 (1962). See also Model Choice of Forum Act (National Conference of Commissioners on Uniform State Laws. 1968).

have disputes resolved in their own courts, but if that choice is not available, then in a neutral forum with expertise in the subject matter. Plainly, the courts of England meet the standards of neutrality and long experience in admiralty litigation. The choice of that forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts.

The argument that such clauses are improper because they tend to "oust" a court of jurisdiction is hardly more than a vestigial legal fiction. It appears to rest at core on historical judicial resistance to any attempt to reduce the power and business of a particular court and has little place in an era when all courts are overloaded and when businesses once essentially local now operate in world markets. It reflects something of a provincial attitude regarding the fairness of other tribunals. No one seriously contends in this case that the forum-selection clause "ousted" the District Court of jurisdiction over Zapata's action. The threshold question is whether that court should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause.

There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power,[14] such

---

[14] The record here refutes any notion of overweening bargaining power. Judge Wisdom, dissenting, in the Court of Appeals noted:

"Zapata has neither presented evidence of nor alleged fraud or undue bargaining power in the agreement. Unterweser was only one of several companies bidding on the project. No evidence contradicts its Managing Director's affidavit that it specified English courts 'in an effort to meet Zapata Off-Shore Company half way.' Zapata's Vice President has declared by affidavit that no specific negotiations concerning the forum clause took place. But this was not simply a form contract with boilerplate language that Zapata

as that involved here, should be given full effect. In this case, for example, we are concerned with a far from routine transaction between companies of two different nations contemplating the tow of an extremely costly piece of equipment from Louisiana across the Gulf of Mexico and the Atlantic Ocean, through the Mediterranean Sea to its final destination in the Adriatic Sea. In the course of its voyage, it was to traverse the waters of many jurisdictions. The *Chaparral* could have been damaged at any point along the route, and there were countless possible ports of refuge. That the accident occurred in the Gulf of Mexico and the barge was towed to Tampa in an emergency were mere fortuities. It cannot be doubted for a moment that the parties sought to provide for a neutral forum for the resolution of any disputes arising during the tow. Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where the *Bremen* or Unterweser might happen to be found.[15] The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade,

---

had no power to alter. The towing of an oil rig across the Atlantic was a new business. Zapata did make alterations to the contract submitted by Unterweser. The forum clause could hardly be ignored. It is the final sentence of the agreement, immediately preceding the date and the parties' signatures. . . ." 428 F. 2d 888, 907.

[15] At the very least, the clause was an effort to eliminate all uncertainty as to the nature, location, and outlook of the forum in which these companies of differing nationalities might find themselves. Moreover, while the contract here did not specifically provide that the substantive law of England should be applied, it is the general rule in English courts that the parties are assumed, absent contrary indication, to have designated the forum with the view that it should apply its own law. See, *e. g., Tzortzis* v. *Monark Line A/B*, [1968] 1 W. L. R. 406 (C. A.) ; see generally 1 T. Carver, Carriage by Sea 496–497 (12th ed. 1971) ; G. Cheshire, Private International Law 193 (7th ed. 1965) ; A. Dicey & J. Morris, The Conflict

commerce, and contracting. There is strong evidence that the forum clause was a vital part of the agreement,[16] and it would be unrealistic to think that the parties did not conduct their negotiations, including fixing the monetary terms, with the consequences of the forum clause figuring prominently in their calculations. Under these circumstances, as Justice Karminski reasoned in sustaining jurisdiction over Zapata in the High Court of Justice, "[t]he force of an agreement for litigation in this country, freely entered into between two competent parties, seems to me to be very powerful."

---

of Laws 705, 1046 (8th ed. 1967); Collins, Arbitration Clauses and Forum Selecting Clauses in the Conflict of Laws: Some Recent Developments in England, 2 J. Mar. L. & Comm. 363, 365–370 and n. 7 (1971). It is therefore reasonable to conclude that the forum clause was also an effort to obtain certainty as to the applicable substantive law.

The record contains an affidavit of a Managing Director of Unterweser stating that Unterweser considered the choice-of-forum provision to be of "overriding importance" to the transaction. He stated that Unterweser towage contracts ordinarily provide for exclusive German jurisdiction and application of German law, but that "[i]n this instance, in an effort to meet [Zapata] half way, [Unterweser] proposed the London Court of Justice. Had this provision not been accepted by [Zapata], [Unterweser] would not have entered into the towage contract . . . ." He also stated that the parties intended, by designating the London forum, that English law would be applied. A responsive affidavit by Hoyt Taylor, a vice president of Zapata, denied that there were any discussions between Zapata and Unterweser concerning the forum clause or the question of the applicable law.

[16] See nn. 14–15, *supra*. Zapata has denied specifically discussing the forum clause with Unterweser, but, as Judge Wisdom pointed out, Zapata made numerous changes in the contract without altering the forum clause, which could hardly have escaped its attention. Zapata is clearly not unsophisticated in such matters. The contract of its wholly owned subsidiary with an Italian corporation covering the contemplated drilling operations in the Adriatic Sea provided that all disputes were to be settled by arbitration in London under English law, and contained broad exculpatory clauses. App. 306–311.

Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside. Although their opinions are not altogether explicit, it seems reasonably clear that the District Court and the Court of Appeals placed the burden on Unterweser to show that London would be a more convenient forum than Tampa, although the contract expressly resolved that issue. The correct approach would have been to enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching. Accordingly, the case must be remanded for reconsideration.

We note, however, that there is nothing in the record presently before us that would support a refusal to enforce the forum clause. The Court of Appeals suggested that enforcement would be contrary to the public policy of the forum under *Bisso* v. *Inland Waterways Corp.,* 349 U. S. 85 (1955), because of the prospect that the English courts would enforce the clauses of the towage contract purporting to exculpate Unterweser from liability for damages to the *Chaparral.* A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision. See, *e. g., Boyd* v. *Grand Trunk W. R. Co.,* 338 U. S. 263 (1949). It is clear, however, that whatever the proper scope of the policy expressed in *Bisso,*[17] it does not reach this case. *Bisso* rested on considerations with respect to the towage business strictly in

[17] *Dixilyn Drilling Corp.* v. *Crescent Towing & Salvage Co.,* 372 U. S. 697 (1963) (*per curiam*), merely followed *Bisso* and declined to subject its rule governing towage contracts in American waters to "indeterminate exceptions" based on delicate analysis of the facts of each case. See 372 U. S., at 698 (Harlan, J., concurring).

American waters, and those considerations are not controlling in an international commercial agreement. Speaking for the dissenting judges in the Court of Appeals, Judge Wisdom pointed out:

"[W]e should be careful not to over-emphasize the strength of the [*Bisso*] policy. . . . [T]wo concerns underlie the rejection of exculpatory agreements: that they may be produced by overweening bargaining power; and that they do not sufficiently discourage negligence. . . . Here the conduct in question is that of a foreign party occurring in international waters outside our jurisdiction. The evidence disputes any notion of overreaching in the contractual agreement. And for all we know, the uncertainties and dangers in the new field of transoceanic towage of oil rigs were so great that the tower was unwilling to take financial responsibility for the risks, and the parties thus allocated responsibility for the voyage to the tow. It is equally possible that the contract price took this factor into account. I conclude that we should not invalidate the forum selection clause here unless we are firmly convinced that we would thereby significantly encourage negligent conduct within the boundaries of the United States." 428 F. 2d, at 907–908. (Footnotes omitted.)

Courts have also suggested that a forum clause, even though it is freely bargained for and contravenes no important public policy of the forum, may nevertheless be "unreasonable" and unenforceable if the chosen forum is *seriously* inconvenient for the trial of the action. Of course, where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable.

We are not here dealing with an agreement between two Americans to resolve their essentially local disputes in a remote alien forum. In such a case, the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause. The remoteness of the forum might suggest that the agreement was an adhesive one, or that the parties did not have the particular controversy in mind when they made their agreement; yet even there the party claiming should bear a heavy burden of proof.[18] Similarly, selection of a remote forum to apply differing foreign law to an essentially American controversy might contravene an important public policy of the forum. For example, so long as *Bisso* governs American courts with respect to the towage business in American waters, it would quite arguably be improper to permit an American tower to avoid that policy by providing a foreign forum for resolution of his disputes with an American towee.

This case, however, involves a freely negotiated international commercial transaction between a German and an American corporation for towage of a vessel from the Gulf of Mexico to the Adriatic Sea. As noted, selection of a London forum was clearly a reasonable effort to bring vital certainty to this international transaction and to provide a neutral forum experienced and capable in the resolution of admiralty litigation. Whatever "inconvenience" Zapata would suffer by being forced to litigate in the contractual forum as it agreed to do was clearly

---

[18] See, *e. g.,* Model Choice of Forum Act § 3 (3), *supra,* n. 13, comment: "On rare occasions, the state of the forum may be a substantially more convenient place for the trial of a particular controversy than the chosen state. If so, the present clause would permit the action to proceed. This result will presumably be in accord with the desires of the parties. It can be assumed that they did not have the particular controversy in mind when they made the choice-of-forum agreement since they would not consciously have agreed to have the action brought in an inconvenient place."

foreseeable at the time of contracting. In such circumstances it should be incumbent on the party seeking to escape his contract to show that trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. Absent that, there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain.

In the course of its ruling on Unterweser's second motion to stay the proceedings in Tampa, the District Court did make a conclusory finding that the balance of convenience was "strongly" in favor of litigation in Tampa. However, as previously noted, in making that finding the court erroneously placed the burden of proof on Unterweser to show that the balance of convenience was strongly in its favor.[19] Moreover, the finding falls far short of a conclusion that Zapata would be effectively deprived of its day in court should it be

---

[19] Applying the proper burden of proof, Justice Karminski in the High Court of Justice at London made the following findings, which appear to have substantial support in the record:

"[Zapata] pointed out that in this case the balance of convenience so far as witnesses were concerned pointed in the direction of having the case heard and tried in the United States District Court at Tampa in Florida because the probability is that most, but not necessarily all, of the witnesses will be American. The answer, as it seems to me, is that a substantial minority at least of witnesses are likely to be German. The tug was a German vessel and was, as far as I know, manned by a German crew . . . . Where they all are now or are likely to be when this matter is litigated I do not know, because the experience of the Admiralty Court here strongly points out that maritime witnesses in the course of their duties move about freely. The homes of the German crew presumably are in Germany. There is probably a balance of numbers in favour of the Americans, but not, as I am inclined to think, a very heavy balance." App. 212.

It should also be noted that if the exculpatory clause is enforced in the English courts, many of Zapata's witnesses on the questions of negligence and damage may be completely unnecessary.

forced to litigate in London. Indeed, it cannot even be assumed that it would be placed to the expense of transporting its witnesses to London. It is not unusual for important issues in international admiralty cases to be dealt with by deposition. Both the District Court and the Court of Appeals majority appeared satisfied that Unterweser could receive a fair hearing in Tampa by using deposition testimony of its witnesses from distant places, and there is no reason to conclude that Zapata could not use deposition testimony to equal advantage if forced to litigate in London as it bound itself to do. Nevertheless, to allow Zapata opportunity to carry its heavy burden of showing not only that the balance of convenience is strongly in favor of trial in Tampa (that is, that it will be far more inconvenient for Zapata to litigate in London than it will be for Unterweser to litigate in Tampa), but also that a London trial will be so manifestly and gravely inconvenient to Zapata that it will be effectively deprived of a meaningful day in court, we remand for further proceedings.

Zapata's remaining contentions do not require extended treatment. It is clear that Unterweser's action in filing its limitation complaint in the District Court in Tampa was, so far as Zapata was concerned, solely a defensive measure made necessary as a response to Zapata's breach of the forum clause of the contract. When the six-month statutory period for filing an action to limit its liability had almost run without the District Court's having ruled on Unterweser's initial motion to dismiss or stay Zapata's action pursuant to the forum clause, Unterweser had no other prudent alternative but to protect itself by filing for limitation of its liability.[20] Its action in so doing was a direct consequence

---

[20] Zapata has suggested that Unterweser was not in any way required to file its "affirmative" limitation complaint because it

of Zapata's failure to abide by the forum clause of the towage contract. There is no basis on which to conclude that this purely necessary defensive action by Unterweser should preclude it from relying on the forum clause it bargained for.

For the first time in this litigation, Zapata has suggested to this Court that the forum clause should not be construed to provide for an exclusive forum or to include *in rem* actions. However, the language of the clause is clearly mandatory and all-encompassing; the language of the clause in the *Carbon Black* case was far different.[21]

The judgment of the Court of Appeals is vacated and the case is remanded for further proceedings consistent with this opinion.

*Vacated and remanded.*

MR. JUSTICE WHITE, concurring.

I concur in the opinion and judgment of the Court except insofar as the opinion comments on the issues which are remanded to the District Court. In my view these issues are best left for consideration by the District Court in the first instance.

MR. JUSTICE DOUGLAS, dissenting.

Petitioner Unterweser contracted with respondent to tow respondent's drilling barge from Louisiana to Italy. The towage contract contained a "forum selection clause"

could just as easily have pleaded limitation of liability by way of defense in Zapata's initial action, either before or after the six-month period. That course of action was not without risk, however, that Unterweser's attempt to limit its liability by answer would be held invalid. See G. Gilmore & C. Black, Admiralty § 10–15 (1957). We do not believe this hazardous option in any way deprived Unterweser's limitation complaint of its essentially defensive character so far as Zapata was concerned.

[21] See 359 U. S., at 182.

providing that any dispute must be litigated before the High Court of Justice in London, England. While the barge was being towed in the Gulf of Mexico a casualty was suffered. The tow made for Tampa Bay, the nearest port, where respondent brought suit for damages in the District Court.

Petitioners sued respondent in the High Court of Justice in London, which denied respondent's motion to dismiss.

Petitioners, having previously moved the District Court to dismiss, filed a complaint in that court seeking exoneration or limitation of liability as provided in 46 U. S. C. § 185. Respondent filed its claim in the limitation proceedings, asserting the same cause of action as in its original action. Petitioners then filed objections to respondent's claim and counterclaimed against respondent, alleging the same claims embodied in its English action, plus an additional salvage claim.

Respondent moved for an injunction against petitioners' litigating further in the English case and the District Court granted the injunction pending determination of the limitation action. Petitioners moved to stay their own limitation proceeding pending a resolution of the suit in the English court. That motion was denied. 296 F. Supp. 733.

That was the posture of the case as it reached the Court of Appeals, petitioners appealing from the last two orders. The Court of Appeals affirmed. 428 F. 2d 888, 446 F. 2d 907.

Chief Justice Taft in *Hartford Accident Co.* v. *Southern Pacific*, 273 U. S. 207, 214, in discussing the Limitation of Liability Act said that "the great object of the statute was to encourage shipbuilding and to induce the investment of money in this branch of industry, by limiting the venture of those who build the ship to the loss of the ship itself or her freight then pending, in cases of damage or wrong, happening without the privity or

knowledge of the ship owner, and by the fault or neglect of the master or other persons on board; that the origin of this proceeding for limitation of liability is to be found in the general maritime law, differing from the English maritime law; and that such a proceeding is entirely within the constitutional grant of power to Congress to establish courts of admiralty and maritime jurisdiction."

Chief Justice Taft went on to describe how the owner of a vessel who, in case the vessel is found at fault, may limit his liability to the value of the vessel and may bring all claimants "into concourse in the proceeding, by monition" and they may be enjoined from suing the owner and the vessel on such claims in any other court. *Id.,* at 215.

. Chief Justice Taft concluded: "[T]his Court has by its rules and decisions given the statute a very broad and equitable construction for the purpose of carrying out its purpose and for facilitating a settlement of the whole controversy over such losses as are comprehended within it, and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding. . It is the administration of equity in an admiralty court. . . . The proceeding partakes in a way of the features of a bill to enjoin a multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. It looks to a complete and just disposition of a many cornered controversy, and is applicable to proceedings *in rem* against the ship as well as to proceedings *in personam* against the owner, the limitation extending to the owner's property as well as to his person." *Id.,* at 215–216.

The Limitation Court is a court of equity and traditionally an equity court may enjoin litigation in another court where equitable considerations indicate that the other litigation might prejudice the proceedings in the Limitation Court. Petitioners' petition for limitation

subjects them to the full equitable powers of the Limitation Court.

Respondent is a citizen of this country. Moreover, if it were remitted to the English court, its substantive rights would be adversely affected. Exculpatory provisions in the towage control provide (1) that petitioners, the masters and the crews "are not responsible for defaults and/or errors in the navigation of the tow" and (2) that "[d]amages suffered by the towed object are in any case for account of its Owners."

Under our decision in *Dixilyn Drilling Corp* v. *Crescent Towing & Salvage Co.*, 372 U. S. 697, 698, "a contract which exempts the tower from liability for its own negligence" is not enforceable, though there is evidence in the present record that it is enforceable in England. That policy was first announced in *Bisso* v. *Inland Waterways Corp.*, 349 U. S. 85; and followed in *Boston Metals Co.* v. *The Winding Gulf*, 349 U. S. 122; *Dixilyn, supra; Gray* v. *Johansson*, 287 F. 2d 852 (CA5); *California Co.* v. *Jumonville*, 327 F. 2d 988 (CA5); *American S. S. Co.* v. *Great Lakes Towing Co.*, 333 F. 2d 426 (CA7); *D. R. Kincaid, Ltd.* v. *Trans-Pacific Towing, Inc.*, 367 F. 2d 857 (CA9); *A. L. Mechling Barge Lines, Inc.* v. *Derby Co.*, 399 F. 2d 304 (CA5). Cf. *United States* v. *Seckinger*, 397 U. S. 203. Although the casualty occurred on the high seas, the *Bisso* doctrine is nonetheless applicable. *The Scotland*, 105 U. S. 24; *The Belgenland*, 114 U. S. 355; *The Gylfe* v. *The Trujillo*, 209 F. 2d 386 (CA2).

Moreover, the casualty occurred close to the District Court, a number of potential witnesses, including respondent's crewmen, reside in that area, and the inspection and repair work were done there. The testimony of the tower's crewmen, residing in Germany, is already available by way of depositions taken in the proceedings.

All in all, the District Court judge exercised his discretion wisely in enjoining petitioners from pursuing the litigation in England.*

I would affirm the judgment below.

---

*It is said that because these parties specifically agreed to litigate their disputes before the London Court of Justice, the District Court, absent "unreasonable" circumstances, should have honored that choice by declining to exercise its jurisdiction. The forum-selection clause, however, is part and parcel of the exculpatory provision in the towing agreement which, as mentioned in the text, is not enforceable in American courts. For only by avoiding litigation in the United States could petitioners hope to evade the *Bisso* doctrine.

Judges in this country have traditionally been hostile to attempts to circumvent the public policy against exculpatory agreements. For example, clauses specifying that the law of a foreign place (which favors such releases) should control have regularly been ignored. Thus, in *The Kensington,* 183 U. S. 263, 276, the Court held void an exemption from liability despite the fact that the contract provided that it should be construed under Belgian law which was more tolerant. And see *E. Gerli & Co.* v. *Cunard S. S. Co.,* 48 F. 2d 115, 117 (CA2); *Oceanic Steam Nav. Co.* v. *Corcoran,* 9 F. 2d 724, 731 (CA2); *In re Lea Fabrics, Inc.,* 226 F. Supp. 232, 237 (NJ); *F. A. Straus & Co.* v. *Canadian P. R. Co.,* 254 N. Y. 407, 173 N. E. 564; *Siegelman* v. *Cunard White Star,* 221 F. 2d 189, 199 (CA2) (Frank, J., dissenting). 6A A. Corbin on Contracts § 1446 (1962).

The instant stratagem of specifying a foreign forum is essentially the same as invoking a foreign law of construction except that the present circumvention also requires the American party to travel across an ocean to seek relief. Unless we are prepared to overrule *Bisso* we should not countenance devices designed solely for the purpose of evading its prohibition.

It is argued, however, that one of the rationales of the *Bisso* doctrine, "to protect those in need of goods or services from being overreached by others who have power to drive hard bargains" (349 U. S., at 91), does not apply here because these parties may have been of equal bargaining stature. Yet we have often adopted prophylactic rules rather than attempt to sort the core cases from the marginal ones. In any event, the other objective of the *Bisso* doctrine, to "discourage negligence by making wrongdoers pay damages" (*ibid.*) applies here and in every case regardless of the relative bargaining strengths of the parties.