**RED BULL ASSOCIATES, Gordon Weiss and Murray Weiss, Plaintiffs,**

v.

**BEST WESTERN INTERNATIONAL, INC., Defendant.**

No. 88 Civ. 752 (WK).

United States District Court, S.D. New York.

May 17, 1988.

Opinion on Motion for Certification June 3, 1988.

Lewis M. Steel, Steel Bellman & Levine, P.C., New York City, Richard F. Bellman, Miriam F. Clark, on brief, for plaintiffs.

Franz S. Leichter, Wachtell, Manheim & Grouf, New York City, Jeffrey R. Herrmann, Andrew M. Manshel, Margaret K. Suib, of counsel, for defendant.

## MEMORANDUM AND ORDER

### WHITMAN KNAPP, District Judge.

Plaintiffs, owners and operators of a motor hotel known as the Red Bull Motor Inn ("Inn") allege that defendant Best Western International, Inc. ("Best Western") expelled the Inn from membership in and affiliation with Best Western for racially discriminatory reasons, in violation of the federal Fair Housing Law, 42 U.S.C. § 3601, *et seq.*, the Public Accommodations Law, 42 U.S.C. § 2000a–1, *et seq.*, and 42 U.S.C. §§ 1981 and 1982. Plaintiffs contend that the Inn was terminated solely because it was providing lodging to black and Hispanic homeless persons under contract with a local welfare department. Plaintiffs seek a preliminary injunction pursuant to Fed.R.Civ.P. 65 preventing Best Western from taking steps to effectuate termination of the membership agreement with the Inn (including compelling the Inn to remove Best Western signs and logos, and denying the Inn the right to participate in the Best Western reservation system) as well as actual and exemplary damages, costs and attorneys fees. Before us now is defendant's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(3) or to transfer pursuant to 28 U.S.C. § 1404(a) based upon a clause in the Inn's membership agreement with Best Western selecting the state and federal courts of Arizona as the forum for resolution of any disputes between the parties. For reasons which follow, we decline to enforce the forum selection clause and therefore deny the motion.

## FACTS

Plaintiff Red Bull Associates ("Red Bull") is a limited partnership formed for the purpose of owning and operating the Inn, a 145–unit motel located in Poughkeepsie, New York. Plaintiffs Gordon Weiss and Murray Weiss are its principal owners; Gordon Weiss ("Weiss") supervises the Inn's day-to-day operations. Defendant

Best Western is an Arizona non-profit corporation which provides its member hotels with services including use of Best Western's name, logo, emblems and registered marks, participation in a guest referral system and a computer reservation system, and listing in an annual travel guide. The Inn became affiliated with Best Western in 1978. Red Bull purchased the Inn in October 1979, and thereafter entered into annual membership agreements with Best Western.

In 1985, Best Western required all existing members, including plaintiffs, to sign a new Membership Application and Agreement ("Agreement"). The Agreement, signed on September 4, 1985 provides in pertinent part:

This Application and Agreement shall be governed and construed according to the laws of the State of Arizona, unless any obligations under this Application and Agreement shall be invalid or unenforceable under such laws, in which event the laws of the state whose law can apply to and validate the obligations under this Agreement shall apply. This Application and Agreement shall be deemed executed in Phoenix, Arizona.

Applicant acknowledges that Best Western is headquartered in Phoenix, Arizona, that the majority of Best Western's records and employees are in Phoenix, Arizona, and that Phoenix, Arizona is the most convenient locale for actions between Best Western and Applicant.

UNLESS WAIVED BY BEST WESTERN IN WHOLE OR IN PART, THE COURTS LOCATED IN THE STATE OF ARIZONA, STATE OR FEDERAL, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ALL CLAIMS, DISPUTES AND ACTIONS ARISING FROM OR RELATING TO THIS APPLICATION AND AGREEMENT OR TO ANY RELATIONSHIP BETWEEN THE PARTIES HERETO AND VENUE SHALL BE IN THE COURTS LOCATED IN MARICOPA COUNTY, ARIZONA. APPLICANT EXPRESSLY CONSENTS AND SUBMITS TO THE JURISDICTION OF

SAID COURTS AND TO VENUE BEING IN MARICOPA COUNTY, ARIZONA.

In 1986 and 1987, Weiss signed certification forms continuing the Inn's membership for the 1987 and 1988 years. These certifications incorporated all of the terms of the Agreement.

Each Best Western member is inspected for maintenance and housekeeping at least twice a year by one of defendant's field representatives. A score of less than 800 out of a possible 1,000 results in the property being placed on probationary status and reinspected within 90 days. A second failing rating is considered grounds for termination. In addition, grounds for termination exist if a property receives two failing marks within a twelve month period or three such ratings within a twenty four month period. Defendant's rules provide for a final pretermination inspection, and if the score is below 800 points, termination proceedings go forward.

The circumstances giving rise to plaintiffs' contentions began when the Inn entered into a contract with the Westchester Department of Social Services in "approximately April 1986." Affidavit of Gordon Weiss dated February 16, 1988 ("Weiss Aff.") ¶ 5. Under that contract, the Inn was to provide rooms on a long-term basis to be used as temporary housing for homeless families. During the relevant time period, 35 of the Inn's 145 rooms were involved in the long-term rental. Since the inception of the program, approximately 80% of the homeless persons occupying the leased rooms have been black or Hispanic. The Inn had previously rented a block of rooms on a long term basis to the International Business Machines Corporation.

The Inn's membership with Best Western was terminated on November 24, 1987. In the preceding 20 months, the Inn was subject to five inspections by two different inspectors, Richard Byrne and Les Hammond. Plaintiffs failed four of these inspections and passed one. The results of those inspections are tabulated as follows:

| Date | Inspector | Score |
|------|-----------|-------|
| March 17, 1986 | Byrne | 690 (failing) |
| June 28, 1986 | Byrne | 699 (failing) |
| September 30, 1986 | Byrne | 886 (passing) |
| May 19, 1987 | Hammond | 635 (failing) |
| August 20, 1987 | Hammond | 677 (failing) |

Following Hammond's two poor grades, the Inn's membership was terminated. Defendant claims that the disaffiliation was due to the Inn's inability to meet Best Western's housekeeping and maintenance standards. Plaintiffs contend that their property complied with Best Western's objective criteria, but that inspector Hammond gave them low marks because of his hostility to the race of the homeless families. While plaintiffs admit they have had quality control problems in the past, they contend that the deficiencies Byrne noted in early 1986 have been corrected, as evidenced by the passing mark obtained from Byrne in September 1986, several months after the black and Hispanic families had begun occupying the leased rooms.

Plaintiffs have submitted evidence in the form of both documents and affidavits to support their charge of racial bias. The documents consist of Hammond's two reports, which itemize his findings and list the number of points deducted for each deficiency noted. Both reports were mailed to plaintiffs following Hammond's visit. Neither report made reference to the homeless families. However, at the time each report was written, Hammond also prepared an evaluative summary entitled "Remarks" containing extensive comments about the presence of these families. Weiss states that the Remarks were not sent to him along with the rest of Hammond's reports.[1]

In his April 19, 1987 Remarks, Hammond declares:

I did not get to inspect any of the 35 *leased* rooms. I did get to look in one of

1. The Remarks were contained in plaintiffs' file at Best Western headquarters. Weiss asserts that he first saw them on November 24, 1987 when he appeared before Best Western's Board of Directors to contest the Inn's expulsion. The file was given to Gordon and Murray Weiss a few minutes before they were called into the board meeting (Weiss Aff. at ¶ 20).

these rooms. Curtains are torn and the rooms look like refugee tents. There is no way that these rooms meet any modern standard. I was told that the rooms were rented to a construction company but I also believe that there are rooms for welfare or county aid receipiants [sic]. Many children were playing in the back parking lot with no supervision ...

The leased rooms situation creates a visible problem as these rooms are in the main building on the ground floor. As you pull out of the lobby you can see the torn curtains over the entrance doors to these rooms (emphasis in original).

The Remarks for August 20, 1987 contain these observations concerning the rooms used by the minority tenants:

During the inspection we did look at 10 of the rooms that are being rented on a lease basis ... This is a social service situation. The rooms are horrible. I did take pictures of room 119 including one of a stool with a dead roach in it. The rooms are used as apartments by the people staying there ... After you take these rooms out of the picture the property has fair rooms ...

[Mr. Weiss] does not intend to eliminate the lease on the rooms but as long as this situation exists the property will not be up to standard.

In addition to the documents, plaintiffs have submitted two affidavits asserting that Hammond made negative comments concerning the presence of minority tenants during the May 19 visit. Specifically, Weiss states in his affidavit that Hammond remarked, "That looks terrible" with reference to a group of black children playing outdoors on the Inn's grounds and a group of black women sitting on lawn chairs (Weiss Aff. at ¶ 9). Weiss also relates that Hammond "expressed the view that the presence of these [Social Services] people was not conducive to a proper atmosphere in a hotel" (Id. at ¶ 10). Weiss further recounts that during the course of the inspection, Hammond pointed to a black family seated on the lawn and asked who they were. Weiss responded that they were guests affiliated with IBM Corporation (Id. at ¶ 11).

The Inn's manager, Sally Hallett, accompanied Hammond during the May 19 inspection. She reports that Hammond asked her who was occupying the leased units, and she replied, pursuant to Weiss' instructions, that they were construction workers. Upon observing a group of black children playing in the parking lot, Hammond inquired whether all the construction workers were black. Hallett responded that many of them were (Hallett Aff. at ¶ 2).

Gordon and Murray Weiss appeared before Best Western's Board of Directors in Phoenix, Arizona on November 24, 1987 to oppose cancellation of the Inn's membership. Following their presentation, Board members asked questions, most if not all of which involved the lease with the Department of Social Services. Two questions which Weiss specifically recalls concerned how much money the Inn was receiving for the homeless families and whether the homeless tenants were allowed to walk around on the Inn's grounds and use the Inn's facilities (Weiss Aff. at ¶¶ 20–21).

Mr. Hammond, in his affidavit, denies that he made the statements attributed to him by Weiss and Hallett, and asserts that his conclusions were based on "the mandated objective criteria," (Hammond Aff. at ¶ 5) and not upon the race of the Department of Social Services occupants.

## DISCUSSION

It is clear that the parties have presented a substantial issue of fact. Defendant's motion raises the question whether that issue should be litigated in this court or whether the forum selection clause requires that it be litigated in Arizona.

The legal principles which must guide our decision are not disputed. In *The Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 the Supreme Court held that a forum selection clause should be enforced unless plaintiffs show that enforcement would be "unreasonable and unjust." The Court identified two types of factors relevant to

evaluating that criterion: (1) the interests of the parties to the litigation, and (2) the public policy of the forum where suit is brought. With respect to the first category, the Court indicated that we should consider whether the contract was freely negotiated, whether it was affected by "fraud, undue influence or overweening bargaining power," and whether "trial in the contractual forum will be so gravely difficult and inconvenient that [plaintiff] will for all practical purposes be deprived of his day in court." *Id.* at 12, 18, 92 S.Ct. at 1914, 1917. As to the second category, the Court simply said that a "choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought." *Id.* at 15, 92 S.Ct. at 1916.

The first group of factors, reflecting private interests, provides no basis for invalidating the clause before us. Plaintiffs willingly entered into a contract with Best Western for the purpose of obtaining certain benefits that they deemed valuable. There is no gainsaying that those benefits are, indeed, valuable. However, hundreds of hotels and inns operate successfully without them. Plaintiffs therefore cannot be heard to complain that they were coerced into signing a contract of adhesion. Neither are we persuaded by plaintiffs' argument that litigation in Arizona would be so expensive as to deprive them of their day in court. In all likelihood, plaintiffs would not bother to sue in Arizona, but they have failed to demonstrate that it would be impossible for them to do so. In short, had plaintiffs attacked their ouster from Best Western on any ground other than racial discrimination, we would find no reason to set aside the parties' contractual bargain to litigate membership disputes in Arizona.

■ However, the second *Bremen* category presents entirely different considerations. As the Supreme Court has observed with reference to the specific statutes here relied upon, civil rights plaintiffs act not only in their own interests but also—and more importantly—as private attorneys general in vindication of the public interest.

The characterization of the plaintiff as a private attorney general in a public accommodations case first appeared in *Newman v. Piggie Park Enterprises, Inc.* (1968) 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263. The Court there observed (*id.* at 401–402, 88 S.Ct. at 965–966):

When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. A Title II suit is thus private in form only. When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone, but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority.

In suits under Title VIII, the fair housing provisions, the action is not "private in form only," in that a plaintiff seeks damages to put in his or her own pocket. But in *Trafficante v. Metropolitan Life Ins. Co.* (1972) 409 U.S. 205, 211, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 the Court established that this circumstance in no way diminishes the public importance of a plaintiff's role as a private attorney general. Thus, the Court noted (*id.* at 211, 93 S.Ct. at 367):

Since the enormity of the task of assuring fair housing makes the role of the Attorney General in the matter minimal, the main generating force must be private suits in which, the Solicitor General says, the complainants act not only on their own behalf but also as "private attorneys general in vindicating a policy that Congress considered to be of the highest priority" ... The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the bill, "the whole community," and as Senator Mondale who drafted [the fair housing provision] said, the reach of the proposed law was to replace the ghettos "by truly integrated and balanced living patterns." (citations omitted)

These observations apply with force to the situation at bar. There is no merit to defendant's suggestion that these public policy concerns can be equally effectuated in Arizona because the membership agreement provides for litigation in a *federal* court. One of the tools to which these private attorneys general are entitled is a trial by jury. *Curtis v. Loether* (1974) 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (Seventh Amendment entitles either party to demand a jury trial in an action for damages under Title VIII). It is precisely through the jury that the local population will have an opportunity to express its interest in promoting integrated housing arrangements in their own community. It is likely to be of far less immediate concern to jurors living in Phoenix, Arizona whether or not racial discrimination has deprived citizens of another state thousands of miles away of the benefits sought to be protected by the Civil Rights Acts. Congress has declared that the entire community has an interest in ensuring fair housing and equal access to public accommodations for its citizens, and the private attorney general is entitled to have the local residents play the part of fact-finder in determining whether or not defendant's actions were inimical to that goal.

At oral argument, we questioned why the Department of Social Services had not intervened in this lawsuit. In light of the above discussion, this inquiry was wholly irrelevant. Plaintiffs were given the status of private attorneys general precisely because the Congress felt that governmental units could not be relied upon to take the initiative. Nor is it material that plaintiffs may have entered into the contract with Westchester County purely for their own profit. In giving private parties a role in the enforcement of these laws, Congress did not rely upon altruism. It sought to harness economic self interest.

We accordingly find that transferring this litigation to Arizona "would contravene a strong public policy of the forum in which suit is brought," *Bremen*, 407 U.S. at 15, 92 S.Ct. at 1916, and decline to enforce the forum selection clause. Defendant's motion to dismiss or transfer is therefore denied.

SO ORDERED.

### ON MOTION FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)

Defendant has moved for certification of our order of May 17, 1988 for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). For reasons which follow, the motion is granted.

As a preliminary matter, we should like to clarify an observation we made in our original opinion. We stated at page 10, "In all likelihood, plaintiffs would not bother to sue in Arizona, but they have failed to demonstrate that it would be impossible for them to do so." On the basis of that observation, we dismissed as irrelevant plaintiffs' claim to hardship in the event of a removal to Arizona. In context, this was a proper disposition because we were only considering plaintiffs' personal interests. When the expense of litigation is weighed against the potential benefits, it may well be that it would not make sense for plaintiffs to pursue this action in Arizona. Yet it is precisely to allocate such burdens and risks that forum selection clauses are used. Plaintiffs willingly entered into a contract; let them abide by its consequences.

However, as we pointed out at page 10, the situation is wholly different when we view plaintiffs as "private attorneys general." As noted in our original opinion, Congress' basic purpose in incorporating the concept of the private attorney general into the civil rights laws was to encourage litigation of civil rights claims. That public policy would obviously be hindered by enforcing a contract which would prevent or seriously discourage the pursuit of such litigation. Thus, while plaintiffs are free, in the context of a purely private dispute, to bargain away whatever right they may possess to litigate in a particular forum, the right should not be so easily waived when plaintiffs act as private attorneys general.[1]

1. Of course, a plaintiff should not be able to     defeat a valid forum selection clause merely by

Turning to the application for certification, there are three criteria prescribed by the statute: that there be (a) "a controlling question of law" as to which (b) "there is substantial ground for difference of opinion" and (c) that "an immediate appeal ... may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Starting with the first criterion, plaintiffs, in opposing the motion, cite *A. Olinick & Sons v. Dempster Bros., Inc* (2d Cir.1966) 365 F.2d 439, and *von Bulow by Auersperg v. von Bulow* (S.D.N.Y.1986) 634 F.Supp. 1284, for the proposition that the question here posed should not be deemed "controlling." Neither case supports plaintiffs' position. The essence of the Court's decision in *Olinick* is stated in the following sentence from Judge Moore's opinion (at 443):

> We agree ... that § 1292(b) review is not available as a means to review the grant or denial of § 1404(a) motions *for incorrect evaluation of proper factors* (emphasis supplied).

In the case at bar, defendant does not contend that we incorrectly evaluated proper factors. On the contrary, it asserts that we committed an error of law in our interpretation of *The Bremen v. Zapata Off-Shore Co.* (1972) 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513. Accordingly, defendant's appeal would not, in any true sense, attack our exercise of discretion. It would challenge our understanding of the legal rule by which we deemed our discretion to have been controlled.

Nor can it be said, as the court found in *Von Bulow*, that this appeal presents a unique question unlikely to recur in the future. With the increasing use of forum selection clauses in a wide variety of commercial contracts, the question of whether, and to what extent, such clauses should be upheld in civil rights disputes when the effect of enforcement would be to discourage litigation by channeling it to a forum which is burdensome for plaintiff or where he is less likely to succeed is "novel and of public as well as private importance." *Brown v. Bullock* (2d Cir.1961) 294 F.2d 415, 417–18.

As to the second consideration, it is obvious that our interpretation of the Supreme Court's opinion in *Bremen* is one which gives rise to substantial grounds for difference of opinion. We reject the suggestion that the lack of conflicting (or indeed any) authority on the question before us automatically renders it one on which there are no substantial grounds for disagreement. Indeed, it would seem that the very absence of precedent leaves the field wide open for differences of opinion.

With respect to the possibility of advancing the termination of this litigation, plaintiffs' counsel advised us at oral argument that plaintiffs would not pursue the action in Arizona should the forum selection clause be upheld. We have no reason to doubt the good faith of this representation. It follows that insofar as plaintiffs are concerned, a reversal would immediately terminate the litigation. An affirmance, although less assuredly, also seems to us likely to advance ultimate termination by precipitating settlement negotiations.

We accordingly certify our order of May 17, 1988 for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

SO ORDERED.

---

invoking some civil rights provision in its complaint; the civil rights aspect of its claim must be plausible and likely to be of substance. Here, we have not only the usual conflicting affidavits, but plaintiffs' version is supported by the circumstance that, while the inspection reports received by plaintiffs relied exclusively on alleged technical deficiencies in maintenance with no reference to the largely minority homeless families, the "Remarks" of Inspector Hammond subsequently found in the file seemed preoccupied with these tenants.