Gregory MILANOVICH, et
ux., Plaintiffs,

v.

SJK ENTERPRISES, INC., et
al., Defendants.

Civ. A. No. 89–866.

United States District Court,
District of Columbia.

Aug. 17, 1990.

Supplemental Memorandum and Order
Oct. 3, 1990.

Allen M. Hutter, Washington, D.C., for
plaintiffs.

Mitchell H. Stabbe, Washington, D.C.,
for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiffs Gregory and Marjorie Milanovich are residents of the District of Columbia. Defendant Costa Crociere, S.p.A., is an Italian cruise ship owner, and defendant Costa Cruises, Inc., is a Florida-based New York corporation that functions as the general sales agent for cruises on Costa Crociere's vessels.

Mr. and Mrs. Milanovich booked passage, through Costa Cruises, on Costa Crociere's *M.V. Carla Costa* departing San Juan, Puerto Rico, on February 6, 1988, for a week's cruise in the Caribbean Sea. On the morning of February 7, 1988, while the ship was in international waters, a deck chair on the *Carla Costa*'s lido deck in which Gregory Milanovich was sitting collapsed, allegedly causing him serious injury.

The two defendants remaining in this tort action for that injury have moved for summary judgment on the basis of what they contend is a contractual provision of their agreement with plaintiffs purporting to limit to one year the time within which to bring such an action.[1] The facts pertinent to the motion for summary judgment are not in dispute. The result, unfortunately for the Milanoviches, is dictated as a matter of law by a discrete line of cases, dating from the 19th century, respecting terms and conditions of a shipowner's liability expressed in and imposed by the text of cruise tickets.

### I.

Plaintiffs' tickets came in a 13-page booklet, measuring 8½ by 3½ inches, setting out the terms of carriage in very small, but legible, print. *See* Exhibit D to defendants' memorandum. A legend on the front of the booklet read, in red upper-case letters on a white background:

1. Defendant SKJ Enterprises, Inc., a Virginia travel agency, was voluntarily dismissed from the suit in October, 1989.

2. The only case appearing to allow the parties to choose the substantive law to govern their relationship as a matter of contract is *Siegelman v.*

## "IMPORTANT NOTICE

Each passenger should carefully examine this ticket, particularly the conditions on pages 2–10."

One of those conditions, Article 30, established a one-year time limit for bringing personal injury actions. Milanovich was injured on February 7, 1988; he filed this action on March 31, 1989, 51 days out of time, and defendants have thus moved for summary judgment under Article 30. Plaintiffs respond that another provision of the ticket, Article 35, purports to adopt Italian law as the "ruling law of this contract," and they offer proof, in the form of an affidavit of an Italian lawyer, that the one-year limitations period would be unenforceable against plaintiffs under Italian law in the circumstances of this case.

 The maritime law of the United States governs disputes arising out of contracts for the transportation of goods or passengers on the high seas. *The Moses Taylor*, 71 U.S. (4 Wall.) 411, 18 L.Ed. 397 (1867). A cruise for hire is a maritime contract to be enforced in accordance with U.S. maritime law, by reference to which, in the first instance, it must be determined which nation's substantive law shall apply, irrespective of any private understandings to the contrary. Although the federal maritime choice-of-law rules may ultimately remit the parties to foreign substantive law, they do so by identifying the "center of gravity" of the case, not merely by ascertaining the contractual intent of the parties. *DeNicola v. Cunard Line Ltd.*, 642 F.2d 5, 7 n. 2 (1st Cir.1981); *McQuillan v. "Italia" Societa Per Azione Di Navigazione*, 386 F.Supp. 462, 468 (S.D.N.Y.1974), *aff'd*, 516 F.2d 896 (2d Cir.1975); *see also Hodes v. S.N.C. Achille Lauro*, 858 F.2d 905 (3rd Cir.), *cert. dismissed*, —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1988).[2]

*Cunard White Star*, 221 F.2d 189 (2d Cir.1955), relied on heavily by plaintiffs. In *Siegelman*, the Second Circuit held that the federal choice-of-law rules would require the application of English law pursuant to a contract provision similar to the one found here in Article 35, its

■ Under the relevant American conflict-of-laws cases, U.S. substantive law must apply to this contract. Plaintiffs are U.S. citizens; the cruise was advertised in the U.S., and the tickets were purchased through a U.S. travel agent who delivered them to plaintiffs in the District of Columbia; the ship left from and returned to a U.S. port. The only connection the case has with Italy is the nationality of the owner of the vessel and the flag under which she sailed. Every other pertinent factor is American. The "center of gravity" of this case being clearly located in the United States, U.S. law should supply the rules of decision. *See McQuillan, supra,* 386 F.Supp. at 468; *Lubick v. Travel Services, Inc.,* 573 F.Supp. 904, 906 (D.V.I. 1983); *Pisacane v. Italia Societa Per Azioni DiNavigazione,* 219 F.Supp. 424 (S.D.N.Y.1963); *Mulvihill v. Furness, Withy & Co.,* 136 F.Supp. 201 (S.D.N.Y. 1955). *Compare Jansson v. Swedish American Line,* 185 F.2d 212 (1st Cir.1950) (where cruise ticket was bought in Sweden, cruise originated in Sweden, and tort occurred in Swedish waters, Swedish law applied.)

## II.

■ Having concluded that U.S. substantive law must apply, it remains to be decided whether a contract provision in the nature of Article 30 is valid under U.S. maritime law and, if so, whether it has been effectively incorporated into the "contract" between plaintiffs and defendants represented by the cruise ticket. The validity of such a time limitation is implicitly recognized in statutory maritime law. Since 1935, 46 U.S.C.App. § 183b(a) has provided:

It shall be unlawful for the manager, agent, master, or owner of any sea-going

vessel . . . transporting passengers . . . to provide by . . . contract . . . a shorter period . . . for the institution of suits on such claims [for loss of life or bodily injury], than one year. . . .

The statute thus declares, albeit negatively, that contractually stipulated limitations periods of a year or longer *are* lawful, as all the post–1935 cases have held, provided they become a term of the contract which, in turn, depends upon whether the contents of the ticket "reasonably communicated" the presence of the limitation term to the passenger against whom it might be invoked. *Marek v. Marpan Two, Inc.,* 817 F.2d 242, 245 (3rd Cir.1987). That question is, once again, one of law. *Id.,* 817 F.2d at 244; *DeNicola,* 642 F.2d at 11.[3] The cases, all from other jurisdictions, hold that tickets virtually identical to the one at issue here have passed scrutiny as enforceable contracts.

Without going into a detailed comparison of the tickets involved in each case, the general characteristics of those tickets held to be sufficiently communicative have included a boldface or otherwise distinguishing warning to the passenger to read the fine print; placement of this warning on the cover of the ticket booklet; repetition of the warning elsewhere; contrast between the warning and the background on which it is printed; and opportunity afforded the passenger to study the provisions of the ticket by which he is to be bound.

Measured by these criteria, the Court concludes that the tickets given the plaintiffs here reasonably communicated that it contained information of which it was in their interest to be aware. The front cover of the ticket booklet prominently proclaims that an "important notice" follows. It appears in large type in the center of the

---

decision being based, however, solely on contract law notions, *i.e.,* the intent of the parties. The *Siegelman* case does not seem to have been followed generally in that respect.

**3.** Plaintiffs cite language found in one of the early cases, *Silvestri v. Italia Societa Per Azioni DiNavigazione,* 388 F.2d 11, 17 (2d Cir.1968), to the effect that the question is whether the shipowner had "done all it reasonably could to warn the passenger that the terms and conditions

were important." As the *Marek* court observes, however, taken literally, no shipowner could ever comply with such a standard; something more could always be imagined in the way of attention-getting. *See Marek,* 817 F.2d at 245. Later cases have all applied the "reasonable communication" rule. *See McQuillan,* 386 F.Supp. at 467; *Shankles v. Costa Armatori,* 722 F.2d 861, 863 (1st Cir.1983).

cover. Directly beneath is a warning, also in large type (in red ink, defendants aver) to "carefully examine this ticket, particularly the conditions on pages 2–10." Although the type inside the booklet is small, it is legible, and the section headings, including that of Article 30, which is entitled "Limitation of Action Against the Company," are in larger type than the text. At the end of the recitation of conditions the booklet states, again in all capitals: "The holder of this passage ticket do (sic) hereby declare ... that he is aware and adheres to all conditions and clauses set forth in this passage contract and that he specifically approves clauses nos. [list of clauses, including Article 30]." Finally, the last page of the book, the actual ticket, declares, "[b]y accepting or using this ticket the passenger agrees to the terms and conditions appearing on pages 2–10 of Passage Ticket Booklet."

Plaintiffs here were thus alerted to the fact that information of consequence was contained inside the ticket booklet, and that their rights could be affected thereby, particularly after the accident, when a claim for damages had become more than a hypothetical possibility. The warnings were noticeable, repetitive and well-placed, and plaintiffs had the entire year following the mishap to consult the booklet to see if there might be some urgency in filing suit for damages.

For the foregoing reasons, therefore, the Court will enter judgment for defendants, and it is, this 17th day of August, 1990,

ORDERED, that the motion of defendants Costa Cruise, S.p.A., and Costa Cruises, Inc., for summary judgment is granted, and the complaint is dismissed with prejudice.

### SUPPLEMENTAL MEMORANDUM AND ORDER

█ Plaintiffs have moved for reconsideration (and reversal) of this Court's Memo-
randum and Order of August 17, 1990, granting summary judgment for defendants.[1] In essence they contend that the Court failed to appreciate the significance of the Supreme Court's holding in *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) with respect to the enforceability of certain provisions in contracts between parties of different nationalities that might formerly have been denied enforcement in U.S. courts as "contrary to public policy." *The Bremen*, they say, altered the pre-existing decisional law refusing to give effect to any terms of at least international contracts that purport to limit a U.S. court's power to hear and decide cases otherwise within its jurisdiction arising under the contract. After *The Bremen*, say the plaintiffs, "freely negotiated private international agreements unaffected by fraud, undue influence, or overweening bargaining power" are generally to be enforced as written. 407 U.S. at 12, 92 S.Ct. at 1914.

*The Bremen's* specific significance for purposes of this case, plaintiffs submit, is that the issue of the timeliness of the filing of their complaint in this court is now simply a matter of contract interpretation and enforcement. Having specified the law of Italy by which to determine, *inter alia*, the validity of a contractual limitations period that U.S. maritime law would readily respect, defendants must live with the consequences of their bargain and cannot now complain when Italian law operates to nullify it.

In *The Bremen* the Supreme Court permitted enforcement of a provision of a marine towage contract between an American oil-drilling company and the German owner of an oceangoing tugboat designating the English High Court of Justice as the exclusive forum in which any disputes would be resolved relating to the latter's performance in towing the former's oil-drilling rig across the Atlantic Ocean.[2] The realities

---

1. The Court assumes without deciding that it may "reconsider" its ruling uninhibited by any constraints of Fed.R.Civ.P. 59(e) and 60(b).

2. Enroute in tow from Louisiana to Italy, the rig was badly damaged in a storm in the Gulf of
Mexico. The American company commenced suit against the tug and its owner in the U.S. District Court at Tampa, Florida, where the vessel and tow had put in for refuge. The tug owner then initiated rival proceedings in Lon-

of present-day international commerce, the Supreme Court concluded, necessitated a rule allowing trading partners of different nationalities to choose, by contract, a mutually acceptable (and, thus, by definition a mutually "convenient") forum for the resolution of controversies between them unless the result would be unfair, unreasonable or unjust. In so doing the Supreme Court assumed that the substantive law of the forum chosen could govern any case that might arise under the contract, and that the law of that forum could well be inconsistent with the law of some other forum, including an American court, having legitimately acquired jurisdiction over the parties by conventional means.[3]

The Supreme Court's primary objective in deciding *The Bremen* as it did, it appears, was to extinguish much obsolete older authority to the effect that private parties may *never*, by their own agreements, "oust" a court of its otherwise legitimate jurisdiction over a matter. 407 U.S. at 9–12, 92 S.Ct. at 1912–14. At least in modern international commercial contexts, the Supreme Court reasoned, business enterprises of comparable economic power ought to be permitted to negotiate their way to a predictably certain route by which to resolve their disputes, and in the absence of "some compelling and countervailing reason [their agreement] should be honored by the parties and enforced by the courts." 407 U.S. at 12, 92 S.Ct. at 1914.

It is doubtful if the Supreme Court anticipated an extension of the rule of *The Bremen* so far from the circumstances of that case as to allow a passenger ticket for a pleasure cruise to dictate, *as a matter of contract alone*, the terms and conditions upon which a shipowner would be liable to its passenger for personal injury, even if the result were not manifestly unfair.[4] The proposition may be tested by asking whether, were the situation reversed and the limitations clause less favorable to the Milanoviches under Italian law than under the applicable provision of U.S. maritime law, would it nevertheless be enforced under the rule of *The Bremen* in the circumstances of this case. The post-*Bremen* cruise-passenger tort cases seem to recognize that the answer is no, even while acknowledging that the "intent of the parties" (as expressed in the cruise ticket) may now be properly considered, along with the gravitational factors, in choosing which law to apply.

Nevertheless, it is clear that the Supreme Court in *The Bremen* was desirous of fulfilling the "legitimate expectations of the parties [as] manifested in their freely negotiated agreement," so far as possible. 407 U.S. at 12, 92 S.Ct. at 1914. Thus it found that the American plaintiff in *The Bremen* had no reason to expect to adjudicate its claims against its German adversary elsewhere than in London, given the express provision in its contract to that effect. Similarly, to the extent that contract expectations are relevant here, the plaintiffs Milanovich were certainly not counting on later discovering an unrelated general provision of the Italian Civil Code nullifying the explicit time limitation for personal injury suits when they accepted their cruise-ticket "contract."

For the foregoing reasons, therefore, it is, this 3rd day of October, 1990,

ORDERED, that plaintiffs' motion for reconsideration is denied.

---

don. Both courts were expecting to exercise plenary jurisdiction over the controversy.

**3.** In *The Bremen* it was known that the High Court of Justice would apply British substantive law, and that British law would require it to enforce still other provisions of the contract that an American court would not.

**4.** The Supreme Court intimated, in the distinctly commercial context of *The Bremen*, that other issues as well (such as the measure of damages and risk allocation), also being sources of economic uncertainty (and thus presumably unattractive) to prudent business people, might be fit subjects for arms' length bargaining, even if the resulting agreement contravened U.S. domestic law.