ALLIANZ VERSICHERUNGS-AKTIEN-GESELLSCHAFT MUNICH REINSUR-ANCE COMPANY, United States Branch of Munchener Ruckversiche-rungs-Fes., Plaintiffs,

v.

S. S. ESKISEHIR, her engines, boilers, etc., D. B. Deniz Nakliyati T. A. S. (D. B. Turkish Cargo Lines), Defendants.

No. 70–Civ. 4469.

United States District Court,
S. D. New York.

July 11, 1972.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for plaintiffs; by Caspar F. Ewig, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendants; by Donald B. Allen, New York City, of counsel.

CROAKE, District Judge.

MEMORANDUM

On November 9, 1971, the undersigned ordered the dismissal of the present action between German and Turkish corporations upon the ground of *forum non conveniens,* however allowing plaintiffs the opportunity to renew their opposition to defendants' motion to dismiss upon proper proof of the relevant Turk-

ish law pursuant to Rule 44.1, Fed.R. Civ.P. This opportunity was availed of, and in the present motion to vacate the "judgment,"[1] plaintiffs have reasserted their arguments in opposition to dismissal, this time with the support of a rendition and analysis of the relevant foreign law by a competent expert. Likewise, defendants have elaborated upon their original contentions, buttressing them with additional expert analysis and opinion. The present motion is therefore in the nature of a motion for reargument, made out of the normal 10-day time limit by leave of court.

Plaintiffs' arguments are threefold. They contend, first, that this court is the only neutral forum capable of hearing and determining this action; second, that the Turkish courts are incapable of fashioning a remedy to recompense plaintiffs, should they prevail in Turkey; and, third, that any judgment rendered in Turkey would be inadequate either in amount or in collectibility.

## I

The modern Turkish Republic was founded by Kemal Ataturk in 1923, at a time when it was allegedly felt to be imperative that the government act to accelerate the rate of recovery from the devastations of World War I and to promote modernization generally. It is also alleged that this "statist" philosophy has permeated the private commercial area, with the result that today certain state-controlled, commercially-motivated enterprises,[2] regard their activities as consonant with or even identical with the public interest, and therefore feel no compunctions about attempting covertly to influence the judicial apparatus to benefit the "public," i.e., their own particular economic interest. The

clearly implied predicate is that the Turkish courts are susceptible to such machinations.

This argument invites two responses. First, it is generally assumed that the judicial function is at least in part to offset political and economic inequality by impartiality in the adjudication of controversies between unequals, whether they be domestic citizens or include foreigners or the local sovereign. Plaintiffs make no reference to the nature of the alleged Turkish judicial bias, or to the manner of defendants' potential use of their influence. They have therefore not satisfied their burden of demonstrating any lack of objectivity and impartiality in the alternate forum.

Moreover, defendants have affirmatively demonstrated the contrary, by submitting various instances of effective impartiality: Turkish administrative courts have canceled governmental decisions, and foreign interests have recovered in Turkey against governmental enterprises in actions involving maritime matters. See the cases, m.t. "EVITA"–Torpedoboat "AMASRA"–1954, and m.t. "MIRADOR–Salvage vessel "Imroz"–Ist. 1964, cited in the Baran affidavit, p. 3. Clearly there can be no quarrel with the quality of Turkish justice. Plaintiffs' argument evinces, at the least, "something of a provincial attitude regarding the fairness of other tribunals." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

## II

Plaintiffs also argue that the common law doctrine of "maritime tort" is without any available analogue within Turkish jurisprudence, and therefore that to remit them to Turkey would be to ren-

---

1. [*Sic.*] The opinion of the Court dated November 9, 1971, 334 F.Supp. 1225, was not itself a judgment, and there does not appear to have been any judgment entered pursuant thereto, undoubtedly because of the imminency or pendency of the present motion.

2. While the personal defendant D. B. Deniz Nakliyati T.A.S. is incorporated as a commercial company, a majority of its operating capital has been contributed by the government, and its employees are generally considered to be state employees. *See* Karpat reply affidavit, pp. 5, et seq.

der them remedyless. However, they have failed to demonstrate any inability of the Turkish courts to fashion a suitable remedy should plaintiffs prove their factual contentions in Turkish judicial proceedings.

The Turkish Republic is a civil law country, having adopted the code system of law shortly after the founding of the modern republic. The subject of maritime "tort" is covered by a code adapted from the German, with ancillary matters covered by a Code of Obligations or Commercial Code adapted from the Swiss and other European codes, as well as by domestic procedural law. Thus, the Turkish system as it pertains to this controversy is essentially similar to plaintiffs' native law. At a minimum, Turkey would appear to be juridically closer to Germany, by reason of sharing the same Roman law traditions, than this forum would be.

■ Plaintiffs are therefore reduced to the contention that the borrowed substantive law has been so poorly integrated with the Turkish procedural and jurisprudential framework that matters are hopelessly confused and there is no certainty of application of the law. However, it would appear that any initial uncertainty has been ameliorated by a near half-century of application, by the revisions of 1957 apparently incorporating subsequent developments elsewhere, and by possible other revisions including adoption of contemporary Anglo-American developments, after the adoption of a new Constitution in 1961. *See* Metan affidavit, p. 4. A party's reluctance to submit to foreign, although hardly "exotic" or "uncivilized," law is no reason for refusing application of *forum non conveniens*, particularly in the relatively uniform maritime field. *See* Olympic Corp. v. Societe Generale, 462 F.2d 376 (2d Cir. 1972); Burt v. Isthmus Development Co., 218 F.2d 353, 357 (5th Cir.), cert. denied, 349 U.S. 922, 75 S.Ct. 661, 99 L.Ed. 1254 (1955); *cf.* Cuba R. R. v. Crosby, 222 U.S. 473, 478, 480, 32 S.Ct. 132, 56 L.Ed. 274 (1912); *see also* Walton v. Arabian American Oil Co., 233 F.

2d 541, 545 (2d Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956).

■ Plaintiffs particularize their claim of being without a remedy in Turkey in two respects. They first claim that "grave" fault must be demonstrated in Turkey, by the plaintiff, before the relevant doctrine, that of "responsibility" can be invoked. This alternative to tort is then alleged to be unduly burdensome. Suffice it that we remain unconvinced that a plaintiff's burden of proving causation of an accident, such as the one involved herein, is in fact that much different in Turkey from what would be required in this Court.

Plaintiffs also claim prejudice from the alleged lack of mutuality between Turkish and American or other courts regarding enforcement of contractual clauses ousting domestic courts of jurisdiction in advance of litigation. The answer is that, first, the issue is irrelevant in light of the absence of any clause ousting the Turkish court of jurisdiction, and second, the issue is one about which "reasonable [countries] might differ." *See* M/S Bremen v. Zapata Off-Shore Co., *supra*.

### III

Finally, plaintiffs contend that, even if a judgment were rendered in their favor by a Turkish Court, it would necessarily be either insufficient in amount or uncollectible in funds transferrable outside Turkey. The reason stated is that the Turkish law, Article 83 of the Code of Obligations, and Article 1115 of the Maritime Code (cited in Karpat affidavit, ¶ 6, pp. 7–8) requires claims arising out of accidents to be stated in the local currency, Turkish lira, at the exchange rate prevailing at the date of the accident. Judgments, however, are payable at the rate prevailing upon the day of judgment. As a result, should a devaluation of lira relative to the plaintiffs' own currency intervene between the time of the accident and that of any judgment, the maximum amount re-

coverable as it would be evaluated outside Turkey would diminish accordingly.

Plaintiffs allege that such a devaluation has actually occurred.[3] They state that in Istanbul Case No. 1970/486, the Turkish companion to the present action, they initially pleaded a claim evaluated at the post-devaluation exchange rate, but defendants have moved to dismiss the excess over the amount of the claim as it would be stated at the previous exchange rate. The amount to be lost should this motion prove successful, as plaintiffs predict, is approximately U. S. $466,000, and perhaps more in West German marks.

Plaintiffs also allege that, while concededly permission is routinely given for "deblocking" of foreign currency sought to be exported from Turkey and obtained as a result of a valid Turkish judgment, the amount of time required for administrative approval by the Ministry of Finance and the Central Bank is sometimes substantial. Plaintiffs complain that they will be forced to forego interest during this period, and will remain vulnerable to any future currency fluctuations.

In so far as this is merely a claim that Turkish "red tape" is unduly burdensome, it is rejected as clearly insufficient. For that matter, no reason is stated why plaintiffs could not recover promptly against the individual defendant in an independent action based upon the Turkish judgment brought in any neutral forum in which its assets are to be found. Cf. Domingo v. States Marine Lines, 340 F.Supp. 811, 815, 816 (S.D. N.Y.1972). But their claim of prejudice from the Turkish practice relative to the computation of claims and judgments is another matter.

Defendants, recognizing the possible validity of this latter contention, have offered to accept imposition of another condition upon the dismissal of this action, the condition being that any judgment recovered in Turkey against them be payable in United States dollars at an exchange rate not less favorable than that prevailing on the date the loss was sustained. Plaintiffs' attorneys have responded that they were "authorized to accept the terms proposed on receipt of a letter of undertaking from the shipowner's protection and indemnity club agreeing to stand behind [defendants'] representation." (Letter of counsel dated May 9, 1972.)

This counterproposal proved unacceptable, for whatever reason, and defendants reiterated their initial offer.

Defendants' offer is attractive in that it would insulate plaintiffs against their only substantial risk from remission to litigation in Turkey, excepting the usual vicissitudes of litigation anywhere. However, it does create a problem by seeking dismissal upon a condition requiring action, if at all, only on or after rendition of the foreign final judgment. The Court's research has disclosed no case wherein an action was dismissed based upon such a condition. Only conditions prohibiting certain actions, or requiring immediate action, have been imposed. See, e.g., Domingo v. States Marine Lines, supra, 340 F.Supp. at 817.

There is an alternative procedure available, however, which would fully protect plaintiffs, and it will be adopted: the action will not be dismissed; rather, it will be stayed in all respects pending final resolution of Istanbul Case No. 1970/486. The parties herein may take no further action in the present case in this court without prior leave of court, other than the noticing of any motion deemed advisable in light of M/S Bremen v. Zapata Off-Shore Co., supra. No opinion is expressed as to the merits of any such motion.

Submit order on notice.

---

3. Plaintiffs give the exchange rate (lira for $1.00 U.S.) at 9 to 1 as of the accident, then 15 to 1 as of August 9, 1970, and currently 14 to 1. Presumably, the exchange rate for West German marks has suffered similar fluctuations.