35 F.3d 556
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
PURAC ENGINEERING, INCORPORATED; Purac Industryab; NCC AB,
Plaintiffs-Appellees,
v.
COUNTY OF HENRICO, VIRGINIA, Defendant-Appellant,
METRIC CONSTRUCTORS, INCORPORATED, Defendant & Third Party
Plaintiff-Appellee,
v.
INSURANCE COMPANY OF NORTH AMERICA, Third Party Defendant.
 No. 93-2486.
 United States Court of Appeals, Fourth Circuit.
 Argued May 12, 1994.
Decided Sept. 13, 1994.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., Senior District Judge. (CA-93-178-R)
 Joseph Thomas Tokarz, II, County Attorney's Office, Richmond, VA, for appellant.
 A. Wayne Lalle, Jr., Graham & James, Washington, DC; Warren Hunter Britt, Parvin, Wilson, Barnett & Guynn, Richmond, VA, for appellees.
 James T. Moore, III, Joseph P. Rapisarda, Jr., County Attorney's Office, Richmond, VA, for appellant.
 E.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, SPROUSE, Senior Circuit Judge, and DUPREE, Senior United States District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Purac Engineering, Inc. (Purac) brought this declaratory judgment action (later amended to request damages) in the U.S. District Court for the Eastern District of Virginia against the County of Henrico (Henrico) and Metric Constructors, Inc. (Metric) for a declaration as to its rights and duties under a contract. Metric and Henrico filed counterclaims and cross-claims. On the day prior to trial, the parties entered into a joint stipulation that Metric would not seek, or be liable for, damages at trial, and Metric did not participate in the trial. The case was tried to a jury, which found in favor of Henrico, and awarded it damages of $1,800,000. However, unhappy with the result, and having wanted not to be in federal court in the first place, Henrico now appeals. We affirm.
 
 I.
 
 2
 The underlying facts of this case involve the construction of a wastewater treatment facility and composting system for Henrico County. The County of Henrico surrounds the City of Richmond. Until recently, Henrico used Richmond's wastewater treatment facilities to process its own waste. Beginning in the late 1970s, however, Henrico began the planning process to construct its own facility. During the planning stage, Henrico had to determine how to deal with the sludge that wastewater treatment plants produce as a byproduct, and which must be disposed of by "land application" or by other means. In determining the scope of its facility, Henrico decided that it would include the ability to compost the sludge byproduct and then sell it to the public.
 
 
 3
 Briefly, a composting system converts liquid sludge of specified characteristics, generated by upstream secondary digesters at a wastewater facility, into a compost product suitable for sale. The process of converting sludge to compost involves several steps. First, the sludge is placed in a "dewatering" system to separate the water from the sludge solids. The dewatered sludge is then mixed with a bulking agent, called "amendment," which usually is comprised of sawdust, wood shavings or wood chips. That mixture is then treated to further decompose organic solids in the sludge and to kill pathogens that may be present. Finally, the material is dried and cured, creating compost. In designing a composting system, the characteristics of the sludge and amendment to be used in the process are an important factor.
 
 
 4
 The overall project was of considerable size, and Henrico divided the project into three phases. The first phase was the design and construction of the wastewater treatment plant itself. The second was the design of a composting system and the selection and procurement of its equipment. The third was the design and construction of buildings to house the composting system and the subsequent start-up, which included installation of the composting system equipment. It is the interaction of the parties involved in phases two and three that is at issue here.
 
 
 5
 Henrico began constructing the main wastewater treatment facility (phase one) in January 1986. On June 8, 1986, Henrico solicited proposals to provide goods and special services for an "enclosed sludge composting system" to operate as part of the wastewater facility. On February 13, 1987, Purac and its affiliates entered into a contract with Henrico to design and deliver the specified system. The contract is referred to by all parties as the "A3(a) contract." Henrico agreed to pay Purac $6,416,700 for its goods and services. The contractor for phase three, construction of the facility to house the Purac system, had not been identified at that time, and there was no contract in existence regarding phase three.
 
 
 6
 The A3(a) contract between Henrico and Purac contained a number of documents. Included in one of them, the Environmental Protection Agency's Model Subagreement Clauses, was a choice of forum provision that states:
 
 
 7
 Except as may be otherwise provided in this subagreement, all claims, counter-claims, disputes, and other matters in question between the recipient and the contractor arising out of or relating to this subagreement or the breach thereof will be decided by arbitration if the parties mutually agree, or in a court of competent jurisdiction within the State in which the recipient is located.
 
 
 8
 J.A. 119.
 
 
 9
 Subsequently, Henrico issued an invitation to bid on construction of a "sludge dewatering and composting facility." The job was awarded to Metric, and on February 29, 1988, Henrico and Metric entered into a contract for the job, which is referred to as the A3 contract. The contract price was $22,349,056. That contract also included a number of documents, many of them composed of model off-the-shelf provisions. In specific clauses designed to supersede any unwanted model clauses, the A3 contract added choice of law and choice of forum provisions:
 
 
 10
 The Contract Documents shall be construed, governed, and interpreted under the laws of the Commonwealth of Virginia. Should any dispute arise out of or pertaining to the performance of the Contract Documents, such disputes shall be initiated and decided in accordance with the administrative appeals procedure as set forth in Section 11-71 of the Code of Virginia and Section 11-18 of the Code of the County of Henrico or in the Circuit Court of the County of Henrico, Virginia.
 
 
 11
 J.A. 217. Purac was not a party to the A3 contract.
 
 
 12
 As part of the A3 contract terms, Henrico assigned the A3(a) contract to Metric, and Purac received payment for performance under the A3(a) from that point from Metric, not Henrico. The original contract between Henrico and Purac had included a provision notifying Purac of the county's intent to assign the A3(a) contract to the general contractor on the construction phase following selection of that party. The assignment made Metric "totally responsible for all goods and services, except design support services, included in the assigned procurement contract in accordance with the contract assignment provisions contained in the Contract Documents." J.A. 45. Henrico did retain the right to directly receive "liquidated damages for failure to meet the operation efficiency guarantees specified in the Procurement Agreement for Project A3(a)." Id.
 
 
 13
 Subsequently, during its efforts to start-up and test the plant in the summer of 1990, Purac experienced problems. After a review of the project and modifications to the equipment that occurred in the fall of 1990, Purac set a new date for start-up in the spring of 1991. When this date was not met, Purac claimed that the sludge and amendment provided did not meet the specifications of the A3(a) contract. Henrico claimed that Purac's machines were faulty. Purac in the summer of 1991 refused to return to the job, asserting that the county and Metric had breached the contract by providing bad sludge to Purac. On September 18, 1991, Purac formally notified Metric and Henrico that it was terminating the contract for default. Henrico asked Metric to provide the start-up services, and it declined.
 
 
 14
 Negotiations followed, as a result of which Purac agreed to return to the facility and provide start-up services for 90 days. This occurred from July through October 1992, but problems persisted, and the county again had to suspend start-up of the composting facility. In January 1993, Metric notified Purac and Henrico that it refused to make repairs.
 
 
 15
 On March 12, 1993, Purac brought suit in federal court seeking a declaratory judgment and damages resulting from Henrico's refusal to release its performance bond. Henrico moved to dismiss the case on the basis of the forum selection clause in the Henrico-Metric contract, the A3 contract. The district court denied the motion with no memorandum opinion filed. J.A. 425. (Henrico subsequently sued Metric in state court on March 26, 1993; Metric brought a third-party claim against Purac, as did Henrico. That proceeding was stayed pending the outcome of this suit.)
 
 
 16
 The case went to trial. Following trial, the jury found in favor of Henrico, and awarded $1,800,000 in damages. Displeased with this recovery, Henrico appeals, arguing that the district court was in error in denying the county's motion to dismiss based on the forum selection provision in the A3 contract.
 
 II.
 
 17
 Under the A3(a) contract (entered into between Henrico and Purac), suits could be brought on the contract in any competent court within Virginia. Under the A3 contract (entered into between Henrico and Metric), suits only could be brought in the Circuit Court for Henrico County. It is Henrico's contention that the A3 contract is the controlling contract for purposes of this suit, and that its forum selection clause thus should be the one given effect. It does not contend that this court should relieve it from application of the A3(a) clause because it was "unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching," which are valid reasons for escaping the provision. M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972). Nor does Henrico contend that such forum selection clauses are prohibited under Virginia law, a position explicitly rejected by the Virginia Supreme Court in Paul Business Systems, Inc. v. Canon U.S.A., Inc., 397 S.E.2d 804 (Va.1990). Accordingly, the question is not whether to enforce a forum selection clause; it is, instead, which forum selection clause to enforce.
 
 
 18
 The parties agree on the broad point that it is the forum selection clause of the controlling document that is to be given effect. It is the choice between the two contracts that divides them. The parties use many pages of their briefs on the question of which contract is the proper contract to look to in this action, quoting extensively from the A3 and A3(a) contracts to support their positions. In our view, the answer is simply deduced. The controlling contract for this suit is the one that forms the contractual relationship between the parties and establishes the rights conferred and the duties undertaken. Purac brought a claim against Metric and Henrico, asserting that one or the other defaulted on the requirements of the A3(a) contract, and that Purac had no duty to complete the work. Also, Purac asked for the declaration because of a liquidated damages provision in the A3(a) contract that Henrico was threatening to exercise, as well as the fact that Henrico refused to release Purac's performance bond given under the A3(a) contract. Henrico then counter-claimed. The focus of the suit addressed whether the sludge and amendment provided to Purac were not in conformity with the specifications under the A3(a) contract, therefore allowing Purac to walk away. Thus, the claim requires a determination of the rights and duties of each party under the A3(a) contract, as it was in that document that the detailed specifications for the sludge and amendment were outlined.
 
 
 19
 An examination of each of the main contentions asserted by Henrico shows them to be erroneous. First, it claims that, "[i]n order to determine Purac's rights and responsibilities under the A3(a) contract, the A3 contract must be interpreted and applied first." But this is not correct, as it is possible to determine Purac's rights and responsibilities under the A3(a) contract, given that it is that contract that establishes the contract for Purac's goods and services. The A3 contract itself does not address the central issues regarding sludge and amendment characteristics. Indeed, Purac is not even a party to the A3 contract.
 
 
 20
 Henrico further asserts that the A3 contract is the only document that ties all the parties together. We agree that the controlling document to be given effect is the "one document which logically connects all the defendants to the plaintiffs in this action." Friedman v. World Transp., Inc., 636 F.Supp. 685, 691 (N.D. Ill.1986) (internal citations and quotations omitted). But the A3 contract itself does not tie the parties together; it is the A3(a) contract, through its assignment, that does. Purac's only legal relationship with Metric results from the assignment of the A3(a) contract. Purac is not a signatory to the A3 contract. The assignment interposed Metric between Purac and Henrico, except that Henrico retained the right to receive liquidated damages under the A3(a) contract. Thus, the A3(a) contract is the controlling document, for "that single document connects all the plaintiffs with all the defendants." Stephens v. Entre Computer Centers, Inc., 696 F.Supp. 636, 639-40 (N.D. Ga.1988).
 
 
 21
 Henrico claims that the assignment merged and incorporated the forum selection clause of the A3 contract into the A3(a) contract. This is illogical. It should be noted that this theory would not just stop with a simple forum selection clause; instead, its force is to the effect that any contrary clause in the earlier contract is defeated by those of the later. This theory is especially troublesome given the fact that Purac is not a signatory to the A3 contract, and that contract did not come into existence until a year after the signing of the A3(a) contract. Henrico is attempting to hold non-contracting parties to provisions that they did not participate in determining and could not foresee at the time the original contract was entered into.
 
 
 22
 Purac cites a New York case, George Hyman Constr. Co. v. Precision Walls, Inc., 132 A.D.2d 523, 517 N.Y.S.2d 263 (N.Y.App. Div.1987), in support of its position that it is the A3(a) contract that should govern. In that case, suit was brought between a contractor and subcontractor regarding a particular construction project. The contractor attempted to assert the choice of forum provision of the contract between itself and the client, while the subcontractor insisted that the terms of that contract did not apply to its contractual relationship with the contractor. The court sided with the subcontractor, noting that the forum selection clause of the "main contract" should be limited to the parties to that contract absent some clear language to the contrary. Id. at 526, 517 N.Y.S.2d at 264.
 
 
 23
 The present case is closely analogous: following the assignment of the A3(a) contract, Henrico acted as the subcontractor, and its performance was measured by the A3(a) contract. The document that was necessary to construe in determining who was at fault was the A3(a) contract, and its forum selection clause allowed litigation in federal court in Virginia. The district court acted properly in denying the motion to dismiss.
 
 AFFIRMED