**Michael James WITT and Caroline M. Witt, Plaintiffs,**

**v.**

**NATION-WIDE HORSE TRANSPOR-TATION, INC., Robert Owens, and Travis Joseph Turlo, Defendants.**

**4:16-cv-108**

United States District Court, S.D. Iowa, Central Division.

Signed July 25, 2016

Michael James Witt, Michael J. Witt Law Offices, West Des Moines, IA, for Plaintiffs.

Joan M. Fletcher, Patrick E. Shanahan, Dickinson Mackaman Tyler & Hagen PC, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, Judge, U.S. DISTRICT COURT

Plaintiffs filed a petition against Defendants in the Iowa District Court for Polk County on January 31, 2016. Clerk's No. 1–1. Defendants removed the action to this Court on April 14, 2016, on the basis of diversity jurisdiction. Clerk's No. 1. On April 22, 2016, Defendants filed a Motion to Transfer Venue. Clerk's No. 3. Plaintiffs filed a resistance to the Motion on May 4, 2016. Clerk's No. 6. Plaintiffs filed an Amended Complaint on May 9, 2016. Clerk's No. 10. Plaintiffs filed a Second Amended Complaint on May 23, 2016. Clerk's No. 20. Plaintiffs filed a supplemental resistance to Defendants' Motion to Transfer Venue on May 25, 2016. Clerk's No. 21. Defendants filed a Reply in support of their Motion on May 25, 2016. Clerk's No. 22. Plaintiffs filed a sur-reply on June 2, 2016. Clerk's No. 28. The Court also held a hearing on the Motion to Transfer Venue on June 2, 2016. Clerk's No. 27. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Plaintiff Michael J. Witt ("Witt") is the owner of a seven-year old male thoroughbred horse named Sebastian and also known as Purity Express. Second Am. Compl. ¶ 6. Witt purchased the horse intending it to be used by his daughter, Caroline M. Witt ("Caroline"). *Id.* ¶ 8. In May 2015, Sebastian was transported to a stable in Bethel, Pennsylvania so that he could undergo further training with instructor Lisa Bishop ("Bishop"), who along with other professionals, believed that Sebastian had potential to be a champion jumper. *Id.* ¶ 9–11.

In late summer 2015, Witt decided to return Sebastian to Des Moines for further boarding and training at Valley Park Stables. *Id.* ¶ 14. On or about August 18, 2015,[1] Witt contacted Nation-Wide Horse

---

1. Plaintiffs allege in the Second Amended Complaint that Witt's telephone call to NHT occurred on August 31, 2015. Second Am. Compl. ¶ 15. In a supplemental certification attached to his sur-reply brief, however, he claims the phone call occurred on August 18 or 19, 2015. Clerk's No. 19–2 ¶ 1. The Court will assume that the date alleged in the supplemental certification is correct because there is no dispute Witt's phone call was

Transportation, Inc. ("NHT") about the transport, and explained that Sebastian had special attributes and a high value.[2] *Id.* ¶ 15. Witt also contacted three other equine transportation services, but ultimately made the decision to hire NHT because it had "promised the trip back to Iowa would take no more than two, or possibly two and a half, days, which was the shortest travel time offered by all of the interviewed transportation services." *Id.* ¶ 16.

Witt asked Caroline to go on NHT's website and determine what needed to be done to hire NHT for the transport of Sebastian. Clerk's No. 6–1 (Caroline's Certification) ¶ 4; Clerk's No. 6–2 (Witt's Certification) ¶ 4. On August 20, 2015, Caroline went to NHT's website and saw there was an "authorization form" to be filled out. *Id.* Caroline told Witt about the form and, without looking at it himself, Witt told her to fill it out and submit it. Clerk's No. 6–1 ¶ 5; Clerk's No. 6–2 ¶ 5. Caroline observed that there was writing on the form submission page, which she later realized was NHT's legal terms and conditions, but she did not read it before filling in the form and submitting it. Clerk's No. 6–1 ¶ 6–7. In particular, when Caroline clicked on the "authorization form" tab, on the website, she was presented with the following pertinent language, which is all in the same font size, and which appears *above* the spaces to fill in the relevant information for the Sebastian's transport:

> Please read the terms and conditions before filling out the form at the bottom of this page.

The following Terms and Conditions govern the transportation of all horses by Nation-Wide Horse Transportation, Inc. ("Transporter") and you ("Shipper") pursuant to oral or written communications....

Transporter will use reasonable efforts in accordance with industry standards to safely transport, feed and care for the shipped horse(s), but makes no guarantees as to the health or physical condition of the horse(s) upon departure or arrival. Transporter will make commercially reasonable efforts to deliver the horse(s) at or about the requested delivery date but is not responsible for delays due to inclement weather, road closures, mechanical failures, or other acts of force majeure whether or not of a class or kind mentioned herein and not reasonably within Transporter's control....

Transporter will provide, at no additional charge to Shipper, one thousand dollars ($1,000) of limited accidental collision mortality insurance per horse transported ... Shipper understands and acknowledges that the only insurance provided to the Shipper by Transporter is one thousand dollars ($1,000) of limited accidental mortality insurance per horse transporter. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, TRANSPORTER SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, RELIANCE, INCIDENTAL, SPECIAL, DIRECT OR INDIRECT DAMAGES WHATSOEVER, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST

---

made *prior to* Caroline filling out the authorization forms on NHT's website on August 20, 2015. *See* Clerk's No. 3–5 (completed authorization form submitted through NHT's website dated August 20, 2015).

**2.** Plaintiffs allege in the Second Amended Complaint that Sebastian had an estimated market value of between $50,000 and $75,000 at the time he was moved to Pennsylvania, but that he might be worth over $100,000 if successfully trained as a prize jumper. Compl. ¶¶ 11-12.

PROFITS OR FUTURE BREEDING VALUE, PERSONAL INJURY OR ANY OTHER LOSSES UNDER ANY LEGAL THEORY INCLUDING CONTRACT AND TORT, ARISING FROM, OR IN CONNECTION WITH, THIS AGREEMENT.... The rate quoted is for stated delivery and care of the horse(s)....

This sale shall be deemed to have been made in the State of Colorado and shall be governed by the laws of Colorado notwithstanding any conflict-of-laws doctrines. Any claim related to this Agreement must be brought in the courts of El Paso County, Colorado or the tenth federal district courts in Denver, Colorado. The Parties stipulate that venue is proper therein, waive any other jurisdiction and venue whether by virtue of domicile or otherwise, and consent to the in personam jurisdiction of said courts....

This Agreement shall bind and inure to the benefit of the parties and their respective principals, agents, heirs, successors, and permitted assigns. The parties agree that the terms and conditions stated herein shall set forth the entire agreement between the Shipper and the Transporter....

Clerk's No. 3–3 at 1-2. Underneath this language was a form to fill in details of the requested transport. *Id.* at 3. In the section titled "Owner Information," Caroline listed herself as "owner" of the horse, with no reference to Witt. Clerks' No. 3–5 at 1. The transport was to cost $770, with half payable as a deposit and the balance due upon delivery of Sebastian to the stable in Des Moines. *Id.* at 2; Second Am. Compl. ¶ 20. Witt contacted NHT by telephone on August 31, 2015, and paid the deposit with his credit card. Clerk's No. 3–2 (Aff. of NHT owner Brenda Steele) ¶ 8; Pls.' Sur-Reply Br. at 6 ("On August 31, 2015 ...

Witt had another telephone call with a man at [NHT] in order to firm up the contract and make the required down payment on his Visa® credit card.").

Robert Owens ("Owens") and Travis Turlo ("Turlo"), employees of NHT, picked up Sebastian in Pennsylvania at approximately 11:00 p.m. on September 4, 2015. Second Am. Compl. ¶ 21. Although expected earlier, Sebastian did not arrive in Des Moines until about 3:00 a.m. on September 9, 2016. *Id.* ¶ 29. Caroline and an employee of Valley Park Stables were present when the truck arrived. *Id.* ¶ 28. When the trailer door was opened, they observed that Sebastian was "shaking and the ribs on both sides of his body were jutting out, thus showing that he was underfed, undernourished, dehydrated and/or not given sufficient water during the trip." *Id.* ¶ 30. Sebastian was uncooperative when Owens and Turlo attempted to lead him out of the trailer. *Id.* ¶ 31. In an effort to remove Sebastian, they "pushed him violently against a wall and he fell to the floor." *Id.* ¶ 32. Thereafter, they "proceeded to grab the struggling, prostate Sebastian by his two front legs and yank him out of the trailer, sliding him down the ramp on his buttocks with his two hind leg[s] caught underneath him." *Id.* ¶ 34. Plaintiffs allege that Owens's and Turlo's reckless treatment of Sebastian has caused lasting harm in the form of pain and suffering to Sebastian, a reduction in his market value, and a corresponding monetary loss to Witt. *Id.* ¶ 43. In particular, they claim Sebastian's jumping height has been dramatically reduced and he now exhibits an aggressive and wild streak that was not present prior to his transport. *Id.* ¶¶ 36-39. Witt thus asserts causes of action against Defendants for: (1) tortious conduct; (2) violation of Iowa Code § 717B; and (3) breach of warranty, breach of contract, and restitution. Second Am. Compl. ¶¶ 1-58. Caroline also asserts a cause of action for tortious

conduct against Defendants. *Id.* ¶ 59-61. Although there is no dispute that Witt is Sebastian's owner, Caroline claims she has been personally harmed because: (1) Witt purchased Sebastian for her use and enjoyment; (2) she had an agreement with Witt that if Sebastian became a champion jumper, the two would share in his upside market value; and (3) she spent substantial sums of money improving Sebastian's jumping skills prior to his transport and for his rehabilitation after the transport. *Id.*

## II. LAW AND ANALYSIS

### A. *Venue Generally*

Jurisdiction of the federal court in this matter is premised on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiffs are citizens of Iowa, NHT and Owens are citizens of Colorado, and Turlo is a citizen of New Hampshire. The amount in controversy, as detailed in Defendants' Notice of Removal, exceeds the jurisdictional requisite of $75,000.00. *See* Clerk's No. 1 at 5-12. Pursuant to 28 U.S.C. § 1391(a), when jurisdiction is founded on diversity of citizenship, a civil action may be brought in:

(1) a judicial district where any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(a). Venue is clearly proper in Iowa pursuant to § 1391 because a substantial part of the events or omissions giving rise to the claim occurred here. In particular, Plaintiffs allege that the bulk of injury to Sebastian occurred when he was being removed from the transport trailer in Des Moines, Iowa.

### B. *Impact of Forum Selection Clause*

Despite the fact that venue is proper in Iowa, Defendants assert that the case must be transferred to Colorado pursuant to 28 U.S.C. § 1404(a). This section provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought *or to any district or division to which all parties have consented.*" 28 U.S.C. § 1404(a) (emphasis added). According to Defendants, all parties in this case agreed in the contract governing Sebastian's transport that "[a]ny claim related to this Agreement must be brought in the courts of El Paso County, Colorado or the tenth federal district courts in Denver, Colorado." Clerk's No. 3-4 at 1. "[I]t is settled ... that parties to a contract may agree in advance to submit to the jurisdiction of a given court...." *Nat. Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964).

In determining whether to exercise its discretion to transfer an action pursuant to § 1404(a), the Court ordinarily considers a myriad of factors related to the parties' private interests, such as convenience of the parties and witnesses, access to sources of proof and evidence, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining witness attendance, the possibility of viewing relevant premises, and other practicalities related to ensuring expedient and inexpensive trials. *Atl. Marine Const. Co., Inc. v. United States Dist. Court for the W. Dist. of Tex.*, — U.S. ——, 134

S.Ct. 568, 581 & n. 6, 187 L.Ed.2d 487 (2013). As well, the Court considers various public-interest factors, such as administrative difficulties related to court congestion, local interests in having localized controversies decided at home, and the interest of having diversity cases determined by a court familiar with the applicable law. *Id.*; *see Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). Typically, the burden is upon the party seeking transfer to "make a clear showing that the balance of interests weighs in favor of the proposed transfer, and unless that balance is strongly in favor of the moving party, the plaintiff's choice of forum should not be disturbed." *Medicap Pharm., Inc. v. Faidley*, 416 F.Supp.2d 678, 686 (S.D.Iowa 2006) (citations omitted)).

■ This "typical" § 1404(a) analysis, however, does not apply in this case due to the presence of a valid forum selection clause.[3] In *Atlantic Marine*, the United States Supreme Court held that "[w]hen the parties have agreed to a valid forum-selection clause, a district should ordinarily transfer the case to the forum specified in that clause. Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied." *Atl. Marine*, 134 S.Ct. at 581 (finding that enforcement of valid forum selection clauses protects parties' legitimate expectations and "furthers vital interests of the justice system" (citation omitted)). In particular, the Court held when there is a valid forum selection clause, the § 1404(a) analysis must be altered in three ways:

First, the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. . . .

Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-section clause should not consider arguments about the parties' private interests. When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum.

. . .

As a consequence, a district court may consider arguments about public-interest factors only. Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases. Although it is conceivable in a particular case that the district court would refuse to transfer a case notwithstanding the counterweight of a forum-selection clause, such cases will not be common.

Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations. A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits. However, we previously identified an exception to that principle [known as the *Van Dusen* rule] for § 1404(a) transfers, requiring that the

---

**3.** Plaintiffs initially argued in §§ 3 and 4 of their Resistance Brief that the forum selection clause is per se invalid under Iowa law. Plaintiffs withdrew this argument at the hearing on Defendant's Motion to Transfer. *See* Hr'g Tr. at 9, 30.

state law applicable in the original court also apply in the transferee court.... Not only would it be inequitable to allow the plaintiff to fasten its choice of substantive law to the venue transfer, but it would also encourage gamesmanship. Because § 1404(a) should not create or multiply opportunities for forum shopping, we will not apply the *Van Dusen* rule when a transfer stems from enforcement of a forum-selection clause: The court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right.

When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations.... In all but the most unusual cases, therefore, "the interest of justice" is served by holding parties to their bargain.

*Id.* at 581–83.

### C. *Do Extraordinary Circumstances Exist?*

Pursuant to *Atlantic Marine*, it is clear that the Court should enforce the forum selection clause and transfer the case to the United States District Court for Colorado unless Plaintiffs satisfy their burden to show that this case presents extraordinary circumstances such that the forum selection clause should not enforced. To this end, Plaintiffs make five separate arguments. Specifically, they argue that the forum selection clause is inapplicable because it is unconscionable; because it was not freely negotiated; because it does not embrace the claims asserted; because Caroline never consented to the forum selection clause; and because the public interest factors weigh in favor of maintaining the case in Iowa. The Court will address each argument in turn.

### 1. *Unconscionable and not freely negotiated.*

■ In *M/S Bremen v. Zapata Off-Shore Co.*, the Supreme Court found forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). The Supreme Court concluded that a forum selection clause "should control absent a strong showing that it should be set aside." *Id.* at 15, 92 S.Ct. 1907. Factors important in determining the reasonableness of a forum selection clause are whether the clause was the result of an arm's-length transaction, the experience and sophistication of the parties involved in the negotiation, the comparative bargaining positions of the parties, and representation of the parties by legal counsel. *See id.* at 12, 92 S.Ct. 1907; *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 922 F.Supp. 1334, 1344 (N.D.Iowa 1996); *see also Med. Legal Consulting Serv. v. Covarrubias*, 648 F.Supp. 153, 156 (D.Md. 1986) (listing nine factors that have been considered by courts in determining the reasonableness of a forum selection clause). Other reasons for invalidating a forum selection clause include fraud or overreaching, duress, illegality, and other conventional grounds for invalidating a contract. *See N.W. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 376–77 (7th Cir.1990).

■ Generally, a forum selection clause may be deemed unreasonable, unconscionable, or unjust where it is demonstrated "that the forum thus selected is 'so gravely difficult and inconvenient that [the defendant] will for all practical purposes be deprived of his day in court.'" *Foster v. Chesapeake Ins. Co., Ltd.*, 933 F.2d 1207, 1219 (3d Cir.1991) (quoting *M/S Bremen*, 407 U.S. at 18, 92 S.Ct. 1907); *see also RK*

*Dixon Co. v. Dealer Mktg. Servs., Inc.*, 284 F.Supp.2d 1204, 1209 (S.D.Iowa 2003). Here, Plaintiffs argue that the forum selection clause should not be enforced because it is procedurally and substantively unconscionable. Pls.' Br. at 17-18. Specifically, they urge that the clause is substantively unconscionable because "no man in his right mind would ever knowingly and willingly agree that an intentional tort committed against his valuable, beloved horse in his own Iowa community must be adjudicated in a foreign state by disinterested jurors." *Id.* at 17, 92 S.Ct. 1907. Plaintiffs cite no case law in support of this argument and the Court finds nothing conscience shocking about the forum selection clause under the circumstances of this case. *Cf. Comb v. PayPal, Inc.*, 218 F.Supp.2d 1165, 1176–77 (N.D.Cal.2002) (finding a forum selection clause in an arbitration agreement unconscionable where millions of PayPal consumers, with average transaction amounts of a mere $55.00 would be required to travel to California for arbitration and where the evidence supported a conclusion that the clause was intended to "shield PayPal from liability instead of providing a neutral forum in which to arbitrate disputes"). Plaintiffs also argue that the forum selection clause is procedurally unconscionable because it was not sufficiently conspicuous in that it was "written in the same small font

used for all other provisions of the form." *Id.* at 17, 92 S.Ct. 1907 (urging that a "good contracts attorney" will ensure that terms in a form contract affecting important rights of the consumer will be emphasized in some way). The Court also rejects this argument. *See, e.g., Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir.2009) (finding forum selection clause enforceable where it was "in legible type in the same font and type size as the surrounding paragraphs"); *General Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 789 F.Supp.2d 1148, 1158 (D.Minn.2011) ("[T]he fact print is small and boilerplate is not enough to render the contract unenforceable."). In short, there is nothing in the record supporting a belief that the forum selection clause is unconscionable in this case or that Colorado would be such an inconvenient forum that Plaintiffs would essentially be deprived of their day in court by being forced to litigate there.

Plaintiffs next contend that the forum selection clause should not be enforced because it was "part of a 'click on submit' electronic acknowledgment form transmitted over the Internet." Pls.' Resistance Br. at 16. The Court sees no inherent problem in the fact that the contract in this case was entered into through the internet with the use of so-called "clickwrap" or "scrollwrap" terms and conditions.[4] *See Berkson*

---

4. A variety of terms are employed to identify the form of online terms and conditions agreements, including "clickwrap," "shrinkwrap," "browsewrap" and "scrollwrap" among others. Though perhaps not the most technically apt, the Court believes either "clickwrap" or "scrollwrap" best describes the electronic contract in this instance because of the particular structure of NHT's website. Specifically, the website uses a single page form. At the top of the page, the user is given the option to "download the authorization form and send it in." Clerk's No. 3–3 at 1. If the user proceeds scrolling down the page, he will see a green box with the words:

"Please read the terms and conditions before filling out the form at the bottom of the page." *Id.* Immediately below this green box, but *above* the spaces where a user inserts their personal information, are the terms and conditions governing NHT's transportation of horses. *Id.* at 1–2. Then, below the terms and conditions, is the form where the user enters personal information regarding the transport. *Id.* at 3–7. At the bottom of the personal entry spaces, there appears the following statement: "I have read this entire document and the terms and conditions at the top of this webpage understand it completely, and agree to

*v. Gogo LLC*, 97 F.Supp.3d 359, 395 (E.D.N.Y.2015) ("*Clickwrap* refers to the assent process by which a user must click 'I agree',' but not necessarily view the contract to which he or she is assenting. *Scrollwrap* requires users to physically scroll through an internet agreement and click on a separate 'I agree' button in order to assent to the terms and conditions of the host website."). Indeed, courts have routinely upheld the use of electronic agreements such as the one on NHT's website. *See, e.g.*, Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 459 (Dec. 2006) (collecting cases and finding: "Every court to consider the issue has found 'click-wrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable."); *Burcham v. Expedia, Inc.*, No. 4:07CV1963CDP, 20009 WL 586513, at *3 (E.D.Mo. Mar. 6, 2009) (collecting cases and stating that clickwrap agreements "have been routinely upheld by circuit and district courts"); *Siebert v. Amateur Athletic Union of U.S., Inc.*, 422 F.Supp.2d 1033, 1040 (D.Minn.2006) ("Most courts which have considered the issue have upheld arbitration and forum selection clauses in so-called 'clickwrap' or 'shrinkwrap' form contracts.").

Finally, Plaintiffs argue that the forum selection clause is unenforceable because "[n]either Witt nor Caroline read the Authorization Form, much less the forum selection clause. There was absolutely no discussion or negotiation of the terms of the form." Pls.' Resistance Br. at 16. Plaintiffs argue that a forum selection clause can only be considered to be freely negotiated if there is "real, active 'negotiation,' " such as when commercial entities exchange formal, hard-copy contracts and there are "active negotiations or at least ample opportunity to negotiate the clause." *Id.* at 16–17. Plaintiffs' arguments are unavailing. It is well settled that a party's failure to read the terms of an agreement will not operate to make such agreement void or unenforceable. *See* 17A Am. Jur. 2d, *Contracts* § 210 (July 2016) ("A party who voluntarily executes a document without reading it is bound by its terms unless the failure to read the contract is justified by special circumstances, such as fraudulent inducement or mutual mistake of fact."). Case law also makes clear that forum selection clauses are not unenforceable merely because the parties did not engage in actual negotiations concerning the clause.[5] *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 594, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (rejecting the proposition that "a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining"); *M.B. Restaurants, Inc. v. CKE Restaurants, Inc.*, 183 F.3d 750, 753 (8th Cir.1999) ("The fact that the contract was a form contract and that the individual clauses were not actually negotiated does not render the [forum selection] clause per se unenforceable.").

At best, Plaintiffs have made a "bare assertion" that the contract here was offered on a "take it or leave it" basis; such an allegation, however, is insufficient as a

---

be bound by its terms in its entirety.... By clicking 'Submit,' I'm verifying I the [sic] authority this request and to the contents within this form." *Id.* at 6. Stated another way, to reach the portion of the form where a user fills in their personal information, the user must first scroll through all of the applicable terms and conditions.

**5.** Notably, Witt is an attorney who admits that neither he nor Caroline read the forum selection clause, or any of the other terms and conditions on NHT's website. Thus, while Plaintiffs argue that they did not *actually* negotiate the clause, there is no reason to believe that they *could not have* done so had they actually taken the time to review the terms and conditions.

matter of law to establish that a contract is one of adhesion.[6] *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir.2001). Indeed, even if a contract falls under the rubric of the adhesion doctrine, any particular term sought to be invalidated must also be unconscionable. *See e.g., Webb v. R. Rowland & Co.*, 800 F.2d 803, 807 (8th Cir.1986) ("The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision. To be invalid, the provision at issue must be unconscionable."); *Surman v. Merrill, Lynch, Pierce, Fenner & Smith*, 733 F.2d 59, 61 n. 2 (8th Cir.1984) (noting that standardized contracts of adhesion are not per se unenforceable, but courts must determine whether a particular clause is unconscionable) (citing 6A A. Corbin, Contracts § 1376, at 20-22 (1962)). As the Court concluded *supra*, however, the forum selection clause in this case is *not* unconscionable.

*2. Scope of contract.*

■ The forum selection clause provides that "[a]ny claim related to this agreement" shall be brought in Colorado. Clerk's No. 3–3 at 2. Plaintiffs argue that their tort claims and Iowa Code chapter 717B claim are not subject to the forum selection clause because they are insufficiently "related to" the agreement to transport Sebastian. Plaintiffs cite *Farmland Industries, Inc. v. Frazier–Parrott Commodities, Inc.*, in support of their argument. *See* 806 F.2d 848 (8th Cir.1986). In that case, Farmland Industries opened two commodities futures trading accounts with Heinold Commodities. 806 F.2d at 849. The agreement included the following forum selection clause:

> The undersigned ("Customer") agrees to bring any judicial action, including any complaint, counterclaim, cross-claim or third party complaint, arising directly, indirectly, or otherwise in connection with, out of, related to or from this Agreement or any transaction covered hereby or otherwise arising in connection with the relationship between the parties including any action by Customer against Heinold or any person who is an officer, agent, employee or associated person of Heinold at the time the cause of action arises, only in courts located within Cook County, Illinois, unless Heinold voluntarily in writing expressly submits to another jurisdiction....

*Id.* In a suit by Farmland against Heinold, Farmland alleged that one of Heinold's employees engaged in a kickback scheme with another commodities brokerage firm. *Id.* The Eighth Circuit affirmed the district court's conclusion that Farmland's claims were broader than the forum selection clause because Farmland had "alleged an elaborate scheme of fraud involving not only Heinold and individuals associated with Heinold, but also involving other individuals outside the securities brokerages, sham corporations, and other matters not subject to the agreement between plaintiff and Heinold." *Id.* at 852 (quoting district court decision). The Eighth Circuit agreed that under these circumstances, "Farmland could not have anticipated having to litigate these claims" in the jurisdiction specified in the forum selection clause." *Id.*

Plaintiffs urge the Court to follow *Farmland* because the "fraud alleged in

---

**6.** An adhesion contract is generally defined as one that is "drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms.' "

*Pennsylvania Life Ins. Co. v. Simoni*, 641 N.W.2d 807, 813 (Iowa 2002) (quoting Restatement (Second) of Conflict of Laws § 187 cmt. b, at 135 (Rev. 1988)).

*Farmland* is a tort, a 'bad' tort," and the "gravamen of [Plaintiffs'] Amended Complaint is tort, including intentional or 'bad' tort and criminal animal abuse, committed by two co-defendants who were not parties to the Authorization Form." Pls.' Resistance Br. at 16. The present case, however, is readily distinguishable from *Farmland*. First, there is no dispute that, at the time of Sebastian's alleged injuries, Owens and Turlo were employees of NHT who were carrying out NHT's contractual obligation to transport Sebastian from Pennsylvania to Iowa. Thus, there is no merit in Plaintiffs' assertion that Owens and Turlo were "not parties to the Authorization Form" because the contract terms clearly provide that the agreement "bind[s] and inure[s] to the benefit of the parties and their respective ... employees." Clerk's No. 3–3 at 2. Second, in *Terra International, Inc. v. Mississippi Chemical Corporation,* the Eighth Circuit emphasized that the applicability of forum selection clauses to tort claims "depends on the intention of the parties reflected in the wording of particular clauses and the facts of each case." 119 F.3d 688, 693 (8th Cir.1997) (quoting *Berrett v. Life Ins. Co. of the SW,* 623 F.Supp. 946, 948–49 (D.Utah 1985)). Thus, it explicitly stated that the *Farmland* decision was "limited to its facts, because the 'directly' or 'indirectly' language was contained in the specific forum selection clause at issue in that case." *Id.* at 694.

The *Terra* Court held that, in evaluating whether a contractual clause applies to tort claims, the following general principles from the Third, First, and Ninth Circuits are particularly useful: (1) "where tort claims 'ultimately depend on the existence of a contractual relationship' between the parties, such claims are covered by a contractually-based forum selection clause"; (2) " '[w]hether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to

interpretation of the contract' "; and (3) " 'contract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties.' " *Id.* at 694 (quoting *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.1983); *Lambert v. Kysar,* 983 F.2d 1110, 1121–22 (1st Cir. 1993); *Manetti–Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 (9th Cir.1988)). Here, as in *Terra,* the non-contract claims "involve the same operative facts as would a parallel claim for breach of contract." *Terra,* 119 F.3d at 695. Indeed, both the tort claims and the Iowa Code claim are premised on Owens's and Turlo's alleged mistreatment of Sebastian *while* he was being transported from Pennsylvania to Iowa. This fundamental claim can be, and in fact is, also asserted as a breach of contract claim in this case. In particular, Plaintiffs allege in the contract count of the Second Amended Complaint that these same facts demonstrate a breach of the contracts' express warranty terms—specifically those that require NHT to "use reasonable efforts ... to safely transport, feed and care for the shipped horse"—and also a breach of the implied warranty that the transport would be conducted in a "professional and workmanlike manner." Clerk's No. 20 at 8 (also alleging that these breaches of the contract "resulted in great physical harm to, and great pain and suffering, of Sebastian; a great diminution in Sebastian's market value; and in great monetary damage to Plaintiff[s].").

As well, Plaintiff's non-contract claims ultimately depend on the existence of a contractual relationship between the parties. Indeed, Plaintiffs contracted with NHT to transport a horse from one location to another. Without this contract, neither Owens nor Turlo would have had any interaction at all with Sebastian. It is simply not reasonable to believe that injuries

to a horse during the course of a contractual transport from one location to another somehow become "unrelated" to the contract for transportation merely because such injuries are alleged to have been intentionally inflicted during the contractual transport *See Terra*, 119 F.3d at 694 (noting that while the alleged tort claims "do not center around a disagreement over the specific terms of the license agreement, one could argue that they 'relate' to the agreement's interpretation because the tort claims directly involve the entire subject matter of the license agreement"). Finally, the forum selection clause in this case also appears applicable to Plaintiffs' non-contract claims because their resolution will, in fact, require some interpretation of the contract. Specifically, the reviewing court will be required to evaluate whether such claims can stand in the face of contractual language limiting NHT's liability. *See* Clerk's No. 3–3 at 1 (providing a limitation of NHT's liability in relation to "any consequential, reliance, incidental, special, direct or indirect damages whatsoever, including without limitation damages for lost profits or future breeding value, personal injury or any other losses under any legal theory including contract and tort, arising from, or in connection with, this agreement.... (capitalization modified from original)). For all of these reasons, the Court concludes that all of Plaintiffs' claims fall within the scope of the forum selection clause.

### 3. Caroline's status.

Plaintiffs next assert that transfer to Colorado is not warranted because

§ 1404(a) permits transfer to another district only when "all parties have consented." *See generally* Pls.' Sur-Reply Br. They claim that even though Caroline listed herself as Sebastian's owner on the Authorization Form, she was merely acting as an agent for Witt, Sebastian's actual owner. *Id.* Thus, they argue, Caroline is not personally bound by the forum selection clause, and the case cannot be transferred pursuant to § 1404(a) because Caroline did not consent to the exclusive jurisdiction of Colorado courts.[7]

■ Given that Caroline has no ownership interest in Sebastian, the Court is dubious that she possesses adequate standing to assert any freestanding claims related to or arising out of Sebastian's transport and injuries. Assuming that she does possess standing, however, the Court finds she is bound by the forum selection clause. General principles of agency law provide that an "agent does not become a party to a contract made on behalf of *a disclosed principal* unless the agent and the third party so agree." Restatement (Third) of Agency § 6.01(a) (emphasis added). "A principal is disclosed if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal and has notice of the principal's identity." *Id.* § 1.04(2)(a).

In this case, Caroline filled out the Authorization Form and listed herself as Sebastian's owner. She did not note anywhere on the form, or otherwise communicate to NHT in any way, that she was

---

7. There appears to be no dispute that Witt is bound by the forum selection clause. He specifically alleges that he is Sebastian's owner and that Caroline acted as his agent when she contracted for Sebastian's transport. Compl. ¶ 6 ("Plaintiff Michael Witt is the owner of a seven-year old male (gelding) thoroughbred horse named Sebastian[.]"); Pls.' Am. &

Supp. Br. at 2 ("Plaintiff Michael Witt concedes that Plaintiff Caroline Witt was acting as his agent in filling out and submitting the form online."). Thus Witt directly contracted with NHT and consented to the forum selection clause by virtue of his agent's actions, or alternatively, he ratified the contract with NHT through his subsequent conduct.

acting as Witt's agent rather than on her own behalf. Plaintiffs nonetheless contend that NHT was aware that Caroline was Witt's agent because of the following:

> As stated in greater detail in Michael Witt's Supplemental Certification submitted herewith, just days before Caroline Witt submitted the online click-wrap contract, Michael Witt had a telephone call with [NHT's] representative in which he identified himself as 'Mike Witt' and explained he might consider hiring [NHT] to transport his horse from Pennsylvania to Iowa. Other matters were discussed; suffice it to say, this was no short, unimpressionable phone call. On August 31, 2015, **prior** to the transportation of the horse, Michael Witt had another telephone call with a man at [NHT] in order to firm up the contract and make the required down payment on his Visa® credit card. The [NHT] representative asked Michael Witt to state his name, exactly as imprinted on the credit card, and his billing address. That address is the same address stated in the online contract; and surely, before quoting the exact amount due that day (i.e., half the contract price), the [NHT] representative had to have matched up the credit card transaction with the contract. All of this demonstrates that Michael Witt was a disclosed principal.... Caroline's innocent misstatement on ownership is a fact without consequence.

Pls.' Sur-Reply Br. at 6.

Plaintiffs' claim that they disclosed Caroline's agency is unconvincing. First, although Witt contends the call was neither short nor unimpressionable, he admits the call lasted a mere five to ten minutes.

Clerk's No. 19–2 (Witt's Supp. Certification) ¶ 5. While the Court does not doubt that the call was significant to Witt, it was likely far less significant to NHT, a company engaged in the business of transporting horses from one location to another throughout the United States that almost certainly fields calls such as Witt's on a regular basis. Second, Witt contends that he contacted NHT about "possibly hiring Defendant corporation to transport Sebastian back to Iowa" and that he spent significant time explaining to NHT "the special attributes and high value of Sebastian." Second Am. Compl. ¶ 16. Plaintiffs, however, make no assertion that Witt disclosed to NHT any identifying physical characteristics about Sebastian that could be matched up with Caroline's submission, or even that he disclosed Sebastian's name during this phone call.[8] Third, and perhaps most significantly, Plaintiffs make no allegation that Witt ever informed NHT that Caroline existed, let alone that she would be serving as his agent in actually executing the Authorization Form. Rather than fulfilling their own burden to "fully disclose" the agency relationship, Plaintiffs attempt to place the onus on NHT, essentially arguing that it should have "connected the dots" because Witt engaged in a 5-10 minute phone call with an unidentified NHT representative several days before Caroline submitted a form online listing herself as the "owner" of a horse to be transported. Even assuming that NHT should have realized that Witt's phone call had some connection with Caroline's submission, Plaintiff makes no attempt to explain why NHT should have presumed an agency relationship. Indeed, it would have been

---

8. To the extent the Complaint alleges that Witt discussed "Sebastian" with NHT (*see* Second Am. Compl. ¶ 16), it is highly significant that when filling out the Authorization Form, Caroline listed only Sebastian's professional name, "Purity Express." Clerk's No. 3–5 at 1.

equally logical for NHT to assume that Caroline was Witt's wife and a co-owner of the horse. Finally, the fact that Witt used his own credit card adds little to the analysis. The contract contained no requirement that the sole owner of Sebastian make payment for the transport and Plaintiffs recount nothing about the payment itself that necessitates a conclusion that NHT should have realized that Caroline was Witt's agent. Accordingly, because neither Witt nor Caroline disclosed the agency relationship, and because Caroline listed herself as "owner" and indicated that she consented to "be bound by [the contract's] terms in its entirety," Caroline is personally bound and cannot avoid the applicability of the forum selection clause to her claims.

### 4. *Public interest factors.*

Finally, Plaintiffs argue that the Court should decline to transfer the case pursuant to § 1404(a) because the public interest considerations are sufficiently extraordinary to warrant non-enforcement of the forum selection clause. In particular, Plaintiffs point out that citizens in an unrelated forum should not be burdened with jury duty and that Iowa has a significant interest in having "localized controversies decided at home." Pls.' Resistance Br. at 19-20. The Court has evaluated Plaintiffs' arguments in this regard and finds them unconvincing. While the case arguably has a stronger connection to Iowa, Colorado is far from a stranger; both NHT and Owens are citizens, NHT maintains its principal place of business there, and the terms of the contract provide that the agreement "shall be deemed to have been made in the State of Colorado." Clerks' No. 3-3 at 2. Moreover, Plaintiffs' arguments are significantly undermined by the fact that the contract at issue contains a choice of law provision, providing that the agreement "shall be governed by the laws of Colorado notwithstanding any conflict-of-laws doctrines." Clerk's No. 3-3 at 2. Certainly Colorado courts are in the best position to apply Colorado law. Under the circumstances, the public policy considerations cited simply do not constitute sufficiently "extraordinary circumstances" to warrant nonenforcement of a valid forum selection clause. *Atl. Marine*, 134 S.Ct. at 575.

### III. CONCLUSION

For the reasons stated herein, Defendant's Motion to Change Venue (Clerk's No. 3) is GRANTED. The Clerk of Court shall transfer this case to the United States District Court for the District of Colorado.

IT IS SO ORDERED.